Jean and Patricia ADAIR, et al., Plaintiffs,

v.

HUNT INTERNATIONAL RESOURCES CORPORATION, Great Western United Corporation, Great Western Cities, Inc., Colorado City Development Company, Colorado City Realty Company, William M. White, Jr., W. H. Hunt, and N. B. Hunt, Defendants.

No. 79 C 4206.

United States District Court, N. D. Illinois, E. D.

June 12, 1981.
On Motion For Reconsideration
Nov. 18, 1981.

738

John M. Bowlus, Ellen J. Morgan, Cotton, Watt, Jones, King & Bowlus, Chicago, Ill., for plaintiffs.

Samuel K. Skinner, James R. Stinson, Sally Ortner, Sidley & Austin, Chicago, Ill., Daniel P. Garcia, Cary B. Lerman, Lucy T. Eisenberg, Munger, Tolles & Rickershauser, Los Angeles, Cal., for Great Western defendants.

## MEMORANDUM AND ORDER

MORAN, District Judge.

This is an action seeking relief on behalf of approximately 1300 individual plaintiffs who allegedly were defrauded into purchasing worthless parcels of land in a planned community development called Colorado City, Colorado. Colorado City was to be developed by defendant, Great Western Cities, Inc. ("GWC") and its related corporate entities, Great Western United Corp. ("GWU"), Hunt International Resources Corp. ("HIRCO"), Colorado City Development Company ("CCDC"), and Colorado City Realty Company ("CCRC"). All of these corporate entities are part of the financial empire of Nelson Bunker Hunt and William Herbert Hunt, who are also named as defendants herein. Presently pending before the court is a barrage of pleading motions filed by the various defendants attacking the procedural and substantive sufficiency of the Second Amended Complaint. That complaint contains six counts, alleging violations of the Organized Crime Control Act ("OCCA"), 18 U.S.C. § 1961 *et seq.*, (Count I); sections 17(a) of the Securities Act of 1933 (the "Securities Act") and 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, (the "Exchange Act"), 15 U.S.C. § 77a *et seq.*, (Count II); section 12(2) of the Securities Act, (Count III); the Interstate Land Sales Full Disclosure Act ("interstate Land Sales Act"), 15 U.S.C. § 1701 *et seq.*, (Counts IV and V); and the Illinois Land Sales Act ("ILSA"), Ill.Rev. Stat. ch. 30, § 371 *et seq.* (Count VI).

The pending motions raise, *inter alia*, claims of improper venue, forum non-conveniens, failure to plead fraud with the requisite particularity under Rule 9(b) of the Federal Rules of Civil Procedure ("FRCP"), lack of personal jurisdiction, and failure to state a cause of action. In addition, the Great Western City defendants [1]

1. For purposes of clarity, it is helpful to divide the defendants into two discrete groups—one consisting of those entities and individuals more directly involved in the planning, sale and development of the Colorado City units (herein- after referred to as the "Great Western" defendants), and a second group, consisting of those named as defendants herein by virtue of their alleged control over the Great Western entities (hereinafter referred to as the "Hunt"

have moved for an order prohibiting unauthorized communications between plaintiffs' counsel and potential Colorado City claimants. For the reasons set forth below, the motions are decided as follows: (1) The motions for a more definite statement are granted and plaintiffs are directed to file a new Amended Complaint by July 15, 1981; (2) The resolution of the Hunt defendants' motions to dismiss for lack of *in personam* jurisdiction is deferred pending the filing of the more detailed amended complaint; (3) The motions to transfer are denied; (4) The motions to dismiss for improper venue are denied; (5) The motions to dismiss Counts I and VI are granted, without leave to amend; and (6) The motions to dismiss Counts III and V are granted with leave to amend. The court does not, herein, reach the unauthorized communications motion.

### 1. Motions to Reconsider Order Granting Leave to File Second Amended Complaint and Motions to Dismiss for Improper Venue.

On May 13, 1980, Judge Bua granted plaintiffs leave to file a Second Amended Complaint.[2] At the same time, he provided defendants with the opportunity to raise objections to his order in the form of a motion to reconsider. The Great Western defendants have availed themselves of this opportunity, raising three arguments in opposition to the filing of the complaint. They contend that leave to amend should have been denied because the Amendment has been unduly delayed, it will result in substantial prejudice to defendants, and it attempts to join parties for whom venue in this district is improper. None of these arguments has any merit.

▪ Rule 15(a) of the Federal Rules of Civil Procedure states that leave to amend a complaint "shall be freely given when justice so requires." The Supreme Court has noted in this regard that the liberal amendment policy embodied in the Rule is "a mandate to be heeded." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). Although the rule gives litigants neither an unqualified right nor the unfettered discretion to expand the scope of an action, the Second Amended Complaint does not result in the degree of prejudice nor is it the product of such undue delay that might warrant denying leave to amend. This supplemental pleading was filed only seven months after the opening of the lawsuit and prior to the initiation of any extensive discovery. It asserts no new legal theories which might cause undue surprise to the defendants but, rather, only adds the individual claims of approximately 675 new plaintiffs, most of whom are Colorado residents (as distinguished from the 700 Illinois residents presently a part of this action).[3] That the addition of new individual claimants might marginally lengthen a potential trial is no reason to deny the amendment, particularly where, as here, there is a substantial identity of legal and factual issues between the claims of the "new" and present claimants.[4] In short,

---

defendants). The Great Western defendants include GWC, GWU, CCDC, CCRC and William White. The Hunt defendants are HIRCO, Nelson Bunker and William Herbert Hunt.

**2.** The instant case was assigned originally to Judge Bua of this district as related to *Great Western Cities, Inc. v. Binstein,* D.C.1979, 476 F.Supp. 827. After the entry of a consent decree in that case, the instant complaint was reassigned to my calendar. Since then, this court has become the repository for an avalanche of related (and not-so-related) cases which have either been filed here originally or transferred from other jurisdictions around the country. In all, at least 7 "Great Western Cities" cases currently are pending on this court's docket.

**3.** This action originally was commenced on October 10, 1979 by approximately 530 plaintiffs primarily residing in Illinois. On November 29, 1979 plaintiffs filed a First Amended Complaint adding about 150 new claimants. There was apparently no objection to the first amendment. It should be noted that the legal theories upon which recovery is sought have never been altered by any of the amendments.

**4.** If anything, the consolidation of all claims of Colorado City lot holders in one complaint would enhance the interests of judicial economy and reduce the total trial time necessary to dispose of the claims. The Amended Complaint would obviate the need for a separate trial of the Colorado claimants' claims as well as duplicative pre-trial proceedings.

the only real prejudice resulting from the amendment is defendants' increased exposure to potential liability. This, however, is hardly the type of prejudice which can be considered "undue".

■ Defendants' final argument—that leave to amend should have been denied because venue over the claims of the Colorado plaintiffs is improper—is similarly without merit.[5] Defendants concede that venue is proper in this forum over the claims of the Illinois plaintiffs but point to the fact that the after-added claimants reside in Colorado and probably purchased their lots in that state. While these facts might be relevant to a motion to transfer pursuant to 28 U.S.C. § 1404(a), they lose their significance here where venue is premised on the special venue provisions of the Interstate Land Sales Act and the Securities Laws.

All of the venue provisions relied on by plaintiffs essentially parallel each other. That is, they all provide for venue in a particular forum regardless of defendants' or plaintiffs' residence if the defendants "transact business" within the district. 15 U.S.C. § 78aa, 15 U.S.C. § 77v, 15 U.S.C. § 1719.[6] Unlike the familiar "minimum contacts" test used to determine personal jurisdiction, these liberal special venue provisions do not require that the activities used to establish venue be "related" or "connected" to the transaction attacked in the complaint. Thus, the fact that Ifuku consummated his purchase in Hawaii or that a Colorado plaintiff bought his land in Colorado does not necessarily defeat venue

in Illinois provided that it can be established that the defendants also transact business within this forum.

The facts presented to the court confirm that the defendants do indeed transact business within Illinois. Defendants GWC, GWU, CCDC, and CCRD are licensed to do business in Illinois. Each has obtained a certificate of authority to do business in this state, which have not been revoked either by the corporations themselves or by the State of Illinois. Each of the corporations has filed an Annual Report with the State of Illinois as required by the Foreign Corporations Act. Ill.Rev.Stat. ch. 32, § 157.115. Still further, CCDC, CCRC and GWC all have retained a registered agent authorized to accept service of process for them within the state, and in this case, service was made upon that agent.

Just as persuasive as evidence that the defendants are doing business in Illinois are documents submitted by plaintiffs indicating that the corporations continue to mail into Illinois notices of late payments as well as bills to collect payments from Illinois residents for the property purchased from GWC. To assert, as GWC and its related entities do, that they no longer transact business within the state because they no longer make sales in Chicago and have closed their Chicago office assumes too narrow a characterization of the nature of their business. The Great Western defendants' business cannot realistically be limited solely to the solicitation of sales of Colorado City lots. Rather, their "business" includes both the securing of real estate sales agree-

---

5. Because this assertion merely repeats the points raised in defendants' motion to dismiss the claims of Frank Ifuku (a resident of Hawaii named as a plaintiff in the original complaint) for improper venue, albeit in a different procedural context, these motions have been considered and resolved together.

6. The venue provisions relevant here provide, in pertinent part:

15 U.S.C. § 77v: . . . Any such suit or action may be brought in the district wherein the defendant is found or is an inhabitant or transacts business, or in the district where the offer or sale took place, if the defendant participated therein . . .

15 U.S.C. § 78aa: . . . Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business.

15 U.S.C. § 1719: . . . Any such suit or action may be brought in the district wherein the defendant is found or is an inhabitant or transacts business, or in the district where the offer or sale took place, if the defendant participated therein . . .

ments, which was previously actively pursued in this state, and the continuing active pursuit of payment on those sales. To claim that mailing into Illinois in these circumstances constitutes the transaction of business elsewhere, but not in Illinois, is to ignore the economic reality that the collection efforts are a continuation of the sales activities which indisputably took place within Illinois.[7]

The fact that at least some of the defendants may be said to transact business in Illinois establishes proper venue with respect to all of them. The liberal venue provisions of the federal statutes at issue here are part of a broader legislative framework to prosecute frauds which, more often than not, are national in scope. As the court in *In re Penn Central Securities Litigation*, 338 F.Supp. 438, 440 (E.D.Pa.1972), commented:

> It would be difficult, if not impossible to accomplish this purpose if, when a complex scheme is alleged involving defendants from many states, venue for a particular district would have to be established as to each alleged participant in the illegal plan by proving that his illegal acts in furtherance of the fraud were committed in that district. An unnecessary multiplicity of suits and fragmenting of the issues involved would be the result of such a venue requirement. I follow the lead of many other courts in reading 15 U.S.C. § 78aa providing *that venue is proper as to all defendants in any district where it is alleged that any one defendant has committed acts that are violative of the act and in furtherance of the alleged illegal scheme.* [Citations omitted].

See also, *Kogok v. Fields*, 448 F.Supp. 197 (E.D.Pa.1978); *Clapp v. Stearns & Co.*, 229 F.Supp. 305, 307 (S.D.N.Y.1964); *SEC v. National Student Marketing Corp.*, 360 F.Supp. 284, 292 (D.D.C.1973).

This court is persuaded that the analysis of the court in the *Penn Central* case applies here. At a minimum, the result of

determining that venue was improper respecting some defendants would be a multiplicity of identical lawsuits in several jurisdictions. The fragmented prosecution by individual purchasers of a complex land fraud suit in several jurisdictions against defendants with substantial resources is, at best, a remote possibility. In short, certain of the defendants transacted business (and continue to do so) within Illinois. These defendants allegedly acted in concert with other individuals and entities in perpetrating a fraud of national scope. The special venue provisions of the Interstate Land Sales Act and the Securities Acts simply do not contemplate that defendants can open up shop in Illinois and other states, sell their "wares", and then retreat elsewhere forcing their buyers, located in several states, to splinter their claims and resources in an attempt to gain redress. Nor do they permit defendants who have participated in such a multi-state fraud, but with that participation outside Illinois, to force defrauded plaintiffs to seek them out in some other forum. *Burkhart v. Allson Realty Trust*, 363 F.Supp. 1286 (N.D.Ill.1973). The protection of such defendants against being unfairly dragged into a lawsuit in which they should not be parties rests, in the first instance, upon Rule 9(b), as hereinafter discussed.

### 2. Motions to Transfer.

The Great Western defendants have moved to transfer this action to the District Court for the District of Colorado, pursuant to 28 U.S.C. § 1404(a). Given the size and complexity of this lawsuit, it is hardly surprising that defendants have been able to marshall facts which lend considerable support to their motion. However, although the question is a close one, for the reasons set forth below the motion is denied.

Congress, in drafting 28 U.S.C. § 1404(a), designated the criteria by which the court is to exercise its discretion with regard to the instant motion. The statute provides, in pertinent part:

---

7. This is particularly true in this particular development plan because the actual development of the property was premised on the need to obtain revenue from prior sales.

[F]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district where it might have been brought.

The resolution of any transfer motion necessarily is dependent largely upon the facts of each particular case. They often dictate which of the factors enumerated above assumes preeminent importance. The court begins its analysis by noting that under § 1404(a) the burden lies with the moving party to establish that a transfer is justified by the balance of conveniences and the interests of justice. "Plaintiff's choice of forum is entitled to deference, and it is defendants' burden to show that another court would better accommodate the parties, witnesses and the interests of justice." *Stinnett v. Third National Bank of Hampden County*, 443 F.Supp. 1014, 1017 (D.Minn.1978).

There are now pending in this district at least seven other cases which are in some way related to the instant dispute. Currently on this court's docket is *Aaland v. Hunt International Resources Corp., et al.*, 80 C 5317, a lawsuit concerning Great Western's Cochiti Lake, Nevada development in which the allegations and substantive legal theories parallel those of the instant case. Judicial economy and convenience to the litigants would be materially enhanced if these cases were coordinated with each other. Other related cases currently pending before the court include libel and slander actions filed by representatives of both sides in the current suit against each other. The ultimate outcome of these cases is, at least in part, affected by the primary fraud suits. The same may be said of certain actions filed by Great Western Cities alleging improper solicitation of actions on the part of plaintiffs' representatives and organizations. Many of these cases have been transferred to this district from other states including Colorado, the site suggested by defendants here. Thus, to grant the motion for a transfer would not only occasion a loss in judicial economy, but also deem these cases the "waifs" of the federal judiciary. They would have no one district in which a court finds it appropriate to coordinate discovery and could find no single forum in which the parties jointly wish to litigate their obviously numerous and deep-seated disputes.

▆▆▆ Obviously, considerations of judicial economy are not "controlling in and of themselves." *Coats Co., Inc. v. Vulcan Equipment Co., Ltd.*, 459 F.Supp. 654 (N.D.Ill.1978). However, "as a general proposition, cases should be transferred to the district where related actions are pending." *SEC v. First National Finance Corporation*, 392 F.Supp. 239, 241 (N.D.Ill.1975). The converse applies here: this court is loath to transfer a related case from the district in which companion actions are pending, thereby forfeiting the benefits of adjudicating related claims in the same tribunal. *See also, Wyndham Associates v. Bintliff*, 398 F.2d 614, 619 (2d Cir. 1968); *Jacobs v. Tenney*, 316 F.Supp. 151, 169 (D.Del.1970), (where these courts elaborated several factors which strongly suggest that related cases be litigated in the same district).

Although defendants vigorously assert that Colorado is significantly more convenient a forum for them, the court is hard-pressed to discover any merit in this claim. Of the Great Western corporate defendants, none seems to have its principal place of business in Colorado.[8] GWU is incorporated in Delaware with its principal place of business in Los Angeles. Great Western Cities is a California corporation and CCRC and CCDC have their corporate headquarters in Los Angeles. In addition, few past or present directors or officers of these

---

**8.** Although the affidavit of David Lloyd in support of the motion for transfer states that CCRC and CCDC have their principal places of business in Colorado City, Colorado, the claim is not wholly credible in view of the fact that all but one of the officers of CCRC and all but two of the officers of CCDC are located in California. This, along with the fact that there is virtually no activity by way of sales or anything else currently being conducted at Colorado City (See Defendants Exhibits to Supplemental Memo), belies defendants' statements by way of affidavit.

entities reside in Colorado. All this suggests that neither Colorado nor Illinois is a totally convenient forum for defendants to litigate this matter. The marginal increase in inconvenience to the defendants created by keeping this case in the Northern District of Illinois cannot be given great weight.

What can be given strong consideration, however, is the great inconvenience a transfer would create for the over 700 individual plaintiffs who bought their property in Illinois and reside in the Chicago metropolitan area. It cannot be ignored that defendants are better equipped economically to bear the burden of litigating the case in a distant forum than are plaintiffs, who primarily are individuals of limited means. This disparity in the financial capabilities of the parties is a significant factor in the court's analysis. In *General Portland Cement Co. v. Perry*, 204 F.2d 316, 320 (7th Cir. 1953), the defendant's greater ability to bear the expense of transporting witnesses was considered by the Seventh Circuit in concluding that a transfer would not be in "the interests of justice." Similarly, the court in *Kane v. Hallmark Insurance Co.*, 409 F.Supp. 467, 468 (S.D.Fla.1976), viewed as significant the fact that a transfer might "prove prohibitive to plaintiff's ability to prosecute her cause of action" when it denied defendants' transfer motion. *See also, Aamco Automatic Transmissions, Inc. v. Bosemer*, 374 F.Supp. 754, 757 (E.D.Pa.1974); *Lanier Business Products v. Graymar Company*, 355 F.Supp. 524, 528 (D.Md.1973); *Goldstein v. Rusen Industries, Inc.*, 351 F.Supp. 1314, 1318 (E.D.N.Y.1972). The comparative economic resources of the parties is relevant here as well.[9]

Were the convenience of non-party witnesses and their accessibility to compulsory process the only factors in the 1404(a) calculus, this case would be heard in Colorado. Defendants, in several detailed affidavits, have demonstrated that the convenience of many material witnesses would be enhanced by a transfer. For example, the complaint puts at issue the fact that adequate water and other utilities could not economically be delivered to Colorado City and that defendants knew this was the case. Obviously, the testimony of officials of entities such as the Colorado City Metropolitan District (formerly the Colorado City Water and Sanitation District) and the Colorado City Metropolitan Recreation District would be relevant on this point. Most of these officials, past and present, reside in Colorado. Similarly, potential witnesses such as the engineers involved in supervising the development of Colorado City and local tax assessors could provide relevant testimony as to the feasibility of defendants' Colorado City visions and the current value of these lots. This live testimony would be more easily secured if the case was transferred. *Coats Company, Inc. v. Vulcan Equipment Co., Ltd.*, 459 F.Supp. 654, 656 (N.D.Ill. 1978); *Delay & Daniels v. Campbell Co.*, 71 F.R.D. 368 (D.S.C.1976).[10]

**9.** The fact that Illinois may be geographically inconvenient for the after-added, non-Illinois plaintiffs is of no moment here. Quite apparently, these individuals have considered that the benefits of consolidating their claims with those of the Illinois claimants outweigh any potential inconvenience which might be occasioned by litigating their claims in a distant forum.

**10.** The Great Western defendants have attempted to make much of the fact that on certain occasions unflattering reports concerning their land developments have been aired in the Chicago media. These claims, however, cannot be given great weight here for several reasons. First, defendants have not cited a single civil case suggesting that adverse pre-trial publicity warrants a transfer to another district. Even conceding, however, that such publicity can and should be considered, Great Western still has failed to forward a plausible argument. It appears that similarly unfavorable news items concerning the Hunts and GWC have been published in Colorado. As such, a transfer to that district hardly would remedy the problem. Moreover, Great Western's claims amount to little more than speculation, rather than the "demonstrable reality" of prejudice required in other circumstances. *See Beck v. Washington*, 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 499 (1962). It simply strains credulity to assume that in a metropolitan area of over four million people, six or twelve could not be found to constitute an impartial jury. This last factor also suggests that GWC's motion, at the very least, is quite premature. This cause is, in all probability, years away from trial, at which

The location of those witnesses in Colorado is by far the most persuasive argument for transfer. It must, however, be weighed against the convenience to plaintiffs of this forum and the interests of justice in resolving these intertwined disputes in one court. This court concludes that the considerations against transfer prevail, and the motion is denied.

### 3. Failure to Plead Fraud with Particularity.

In contrast to the relatively liberal (and minimal) notice pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure, Rule 9(b) provides that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The Rule's demand for greater specificity serves three purposes.

> The first is to inhibit the filing of a complaint as a pretext for discovery of unknown wrongs .... The second aim is to protect potential defendants from the harm that comes to their reputations when they are charged with the commission of acts involving moral turpitude .... Finally, Rule 9(b) serves to ensure that allegations of fraud are concrete and particularized enough to give notice to the defendants of what conduct is complained of to enable the defendants to prepare a defense to such claim of misconduct.

*Gross v. Diversified Mortgage Investors*, 431 F.Supp. 1080, 1087 (S.D.N.Y.1977).

The particularity requirements of Rule 9(b), however, are not unbounded. Rather, they are limited by the admonitions of Rule 8 and its subparts requiring short, plain and concise statements of a claim. As the Seventh Circuit has recognized, *Tomera v. Galt*, 511 F.2d 504 (7th Cir. 1975), Rules 8 and 9 must be "read together." 511 F.2d at 508. "With these principles in mind, the purpose of Rule 9 becomes clear. Rule 9 lists the actions in which *slightly more* is needed for notice. In a fraud action, a

plaintiff need also state 'with particularity' the circumstances constituting the fraud." 511 F.2d at 508.

Against this background, the Second Amended Complaint unquestionably satisfies many of the purposes of the particularity requirements of the Federal Rules. The complaint adequately details, in broad strokes, the nature and essential factual elements of the alleged fraud. Although every instance of fraudulent conduct is not set forth in the pleadings, the defendants are not left guessing as to the outlines of the fraud, its purposes, or the critical facts which are purportedly misrepresentations. Thus, to the extent that defendants assert they have insufficient notice of the alleged wrongs, their claim is rejected. Simply stated, Rule 9, when read "together with" Rule 8, requires no more detail of the fraud than has already been given. Further specifics as to the complained of activities can be acquired readily through the discovery process.

In one important respect, however, the complaint is insufficiently specific. The pleading rules not only require notice of the activities complained of, but also, where multiple defendants are alleged to have participated in the fraud, reasonable notice of the part each defendant is to have played in the scheme. *Lincoln National Bank v. Lampe*, 414 F.Supp. 1270, 1278 (N.D.Ill.1976). The complaint totally fails to provide this type of notice. Rather, the complaint merely identifies each defendant individually and then states:

> 19. The Defendants, through their officers and agents, and their predecessor and successor corporations under the control and direction of the Defendants, their officers, and agents (hereinafter collectively referred to as "the Defendants" unless the context indicates otherwise) in furtherance of the scheme, divice, conspiracy and fraud ... made the following false and fraudulent misrepresentations.

time the effects of any adverse media coverage would be de minimus. *Cf. Walker v. Bishop*,

408 F.2d 1378 (8th Cir. 1969); *United States v. Wolfson*, 282 F.Supp. 772 (S.D.N.Y.1967).

Complaint at § 19. The complaint goes no further toward identifying the role each defendant played in the alleged scheme. It is not enough.

Comparable complaints, *i. e.* those in which allegations against several defendants have been grouped together under the rubric of a "conspiracy," have been considered by other courts and found wanting under Rule 9(b). In *Lincoln National Bank v. Lampe, supra,* plaintiff brought an action under the Securities Acts against a range of individual defendants. As summarized by the court's opinion, the *Lampe* complaint alleged only: "[o]n numerous occasions between 'December 1, 1973 and December 1, 1974' certain representations were made by [defendants] Lampe, Spaco, Lake Forest and Herber." The complaint also claimed that "on December 20, 1973 'defendants made certain additional misrepresentations.'" *Lincoln National Bank v. Lampe,* 414 F.Supp. at 1278.

The defendants in *Lampe* raised Rule 9(b) as a ground for dismissal. Judge Decker agreed, stating:

> It is evident that no defendant can determine from the complaint which of the alleged representations it is specifically charged with having made, nor the identity of the individual by whom and to whom the statements were given, nor the situs and circumstances of the conversation, nor, except for paragraph 11(g) the date of the utterance. All the representations are lumped together, seemingly in an effort to imply that each defendant is responsible for statements made by the others.

*Lincoln National Bank v. Lampe,* 414 F.Supp. at 1278.

If anything, the instant complaint is even less detailed than the one dismissed in *Lampe.* Unlike Lincoln National's pleading, the *Adair* complaint provides no specific date for each misrepresentation, by reference to which defendants might be able to identify for themselves which of the actionable conduct should be ascribed to them. Moreover, in contrast to *Lampe,* where, in certain instances, the complaint distinguished between the various defendants, no similar attempt to differentiate even has been attempted.

Under these circumstances the complaint must be regarded as "an attempt to imply that each defendant is responsible for the acts of others." A review of the applicable law along with some other facts alleged in the complaint, however, reveals that in alleging the complaint so broadly plaintiffs clearly are overreaching. Basic principles of corporate law presume that absent a rather egregious disregard of corporate formalities, one corporate entity or an individual with a substantial interest in the corporation is not automatically or readily responsible for the acts of the entity. Concommitantly, on the basis of the facts that can be adduced from the complaint, it is quite improbable that the overlap between the defendants in connection with the alleged land fraud was as complete as is alleged. Certain of the defendants did not even acquire an interest in the developer or development until after plaintiffs purchased their lots. This fact alone makes the imposition of "across-the-board" liability under the complaint quite problematic.

The necessity for particularized pleading is even more compelling in cases such as this where Congress has provided for localization of a multi-state dispute in a single forum. The Hunt defendants contend that they have had no involvement in the matters of which plaintiffs complain, that they have never had any relationship to Illinois respecting any land developments, and that they are located in a distant forum. Certainly, national process can be a fertile source of abuse. Unless plaintiffs, subject to the dictates of Rule 11, are compelled to allege with some particularity how such distant defendants have participated in the scheme alleged, those defendants have virtually no protection from unfounded suits in a distant and inconvenient forum.

Accordingly, defendants clearly are entitled to a more definite statement of plaintiffs' claims as they relate to each of them individually. Plaintiffs therefore are directed to file an amended complaint setting

forth in reasonable detail, *see Burkhart v. Allson Realty Trust*, 363 F.Supp. 1286 (N.D. Ill.1973); *Trussell v. United Underwriters, Ltd.*, 228 F.Supp. 757 (D.Colo.1964) [11], each defendants' alleged role in the scheme.[12] In all other respects, however, the complaint satisfies the pleading standards for fraud of the federal rules and, thus, defendants' motions to dismiss are denied.

### 4. *Motions to Dismiss for Failure to State a Claim.*

#### a. *The Organized Crime Control Act Claim.*

■ In addition to the "procedural" motions resolved above, the Great Western defendants have raised a series of substantive objections to the legal sufficiency of the complaint. First, defendants claim that the facts averred in the complaint do not state a claim cognizable under the Organized Crime Control Act of 1970. While defendants acknowledge that, at least in the criminal context, the Act has a broad application, they claim that the conduct complained of here is so far removed from the purposes of the legislation that it is not within the ambit of the statute. Although the problem is complicated by the fact that the OCCA is not a model of legislative draftsmanship, this court agrees with defendants. Accordingly, Count I is dismissed.

**11.** In particular, plaintiffs should be guided in the drafting of the Amended Complaint by the *Trussell* court's comments:

It is obvious that a plaintiff may not be privy to the workings of a group of defendants who have acted in concert to defraud him, but he can at least identify the particular defendants who allegedly dealt directly with him, and he can describe the circumstances under which particular defendants dealt directly with him. Under Rule 9(b) the plaintiff cannot be required to allege with particularity the manner in which individual defendants acted in concert, but there is no justification for the secreting of information identifying the actors in the drama and the occasions on which they directly confronted the plaintiffs....

*Trussell v. United Underwriters, Ltd.*, 228 F.Supp. at 774.

**12.** In light of the decision on the Rule 9(b) issue, a ruling on the Hunt defendants' motion

On first glance, plaintiffs' claims would seem to be authorized by the Act. 18 U.S.C. § 1964(c) authorizes "any person injured in his business or property by reason of a violation of § 1962" to sue for treble damages in district court. In turn, § 1962 makes it unlawful for any person to receive "any income derived, directly or indirectly, from a pattern of racketeering activity...." And in § 1961, Congress defined "racketeering activity" with broad strokes: it includes any act punishable under federal mail fraud statutes, or "any offense involving fraud in the sale of securities."

This acknowledgment, of course, does not end the inquiry for it "is a 'familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers.'" *United Steelworkers of America v. Weber*, 443 U.S. 193, 201, 99 S.Ct. 2721, 2727, 61 L.Ed.2d 480 (1979), *quoting, Holy Trinity Church v. United States*, 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892). Instead, the reach of the Organized Crime Control Act must be determined by reference to its legislative history and the purposes of the statute. An examination of these sources indicates that the OCCA was not intended for the use proposed by plaintiffs—that of a federal common law of fraud.

Neither the title of the Act nor the Congress' statement of its purpose admit of

to dismiss for lack of *in personam* jurisdiction is deferred pending the filing of a more particularized pleading. It should be recognized, however, that the disposition of that motion largely is dependent upon plaintiffs' ability to plead, with particularity, the role of the Hunt defendants (as active participants or as "control" persons) in the fraud. The satisfaction of this pleading requirement will likely subject the defendants to suit in this forum based on the provisions of the Securities Acts authorizing nationwide service of process. On the other hand, if plaintiffs are unable to plead, with sufficient specificity, the roles of the Hunt defendants in the alleged scheme, an alternative course of litigation would be to proceed with discovery on the complaint without these defendants, and add them at a later date if the facts disclosed upon such discovery so warrant.

much ambiguity. The Senate report states that the act, "has as its purpose the elimination of the infiltration of organized crime and racketeering into legitimate organizations operating in interstate commerce." Organized Crime Control Act of 1969, Report of the Committee on the Judiciary, United States Senate, No. 91–617 at 76. The congressional debates also are replete with unvarying statements of the statute's desired objective. As Senator Dole of Kansas emphasized:

It is impossible to overstress the importance of S. 30's legislative attack on organized crime . . . Title IX of the Organized Crime Control Act . . . contains a proposal designed to curtail—and eventually to eradicate—the vast expansion of organized crime's economic power. Broadly speaking, this title would create strict criminal penalties for using the proceeds of racketeering activity to acquire an interest in businesses engaged in interstate commerce, or to acquire or operate such businesses by racketeering methods.

116 Cong.Rec. at 36296 (Oct. 12, 1976). See also, S.Rep. 91–617, 91st Cong. 1st Sess. at 78–79; 116 Cong.Rec. 35319 (Oct. 7, 1970) (remarks of Cong. Roth).

That the Act's definition of racketeering activity was broadly worded and without explicit reference to "organized crime" reflects less a Congressional desire to expand the scope of the legislation than the recognition that some flexibility was needed both as a practical matter and to avoid constitutional difficulties. Rep. Biaggi of New York expressed the congressional sentiment in commenting that a restrictive definition of organized crime was hardly necessary, that it "would raise serious constitutional problems" and that "to require a general showing that organized crime is involved as a predicate for the use of investigative techniques would be to cripple those techniques." 116 Cong.Rec. 35343 (Oct. 7, 1970). Representative Poff also doubted that a meaningful definition of "organized crime" was even possible. 116 Cong.Rec. 35344.

The inclusion of civil remedies in § 1964 similarly was not intended to alter the Act's direction or focus. The House report explaining the amendments to S. 30 made clear that civil actions were viewed only as a collateral means of accomplishing the primary purposes of the legislation. That report states:

Section 1964 provides civil remedies for the violation of section 1962 above.

Subsection (a) contains broad provisions to allow for reform of corrupted organizations. Although certain remedies are set out, the list is not meant to be exhaustive, and the only limit on remedies is that they accomplish the aim set out of removing the corrupting influence . . . .

H.R.Rep.No.91–1549, 91st Cong., 2d Sess., (1970), reprinted in 2 U.S.Code Cong. & Admin.News, 4007, 4034.

Given this background, it seems reasonably clear that the limit of the Act's application is to entities involved with "organized crime" or activities within the penumbra of that phrase. It is not necessary to define specifically "racketeering activity" to be confident that the OCCA will not admit of the use put to it by plaintiffs. There simply is no hint in the congressional proceedings that the Act was viewed as an alternative, and cumulative, remedy for private plaintiffs alleging securities fraud or misrepresentations in the context of real estate transactions. Under analogous circumstances, another court has refused to extend to Act beyond its intended scope. In *Barr v. WUI/TAS, Inc.*, 66 F.R.D. 109 (S.D.N.Y.1975), plaintiffs originally pursued an antitrust theory against defendants who allegedly unlawfully raised their customers' bills by 20%. When plaintiff attempted to amend its complaint to state a claim under the OCCA the court commented:

An examination of the legislative history of the Act convinces us that the Act was not intended to create a private cause of action upon facts such as those alleged here. . . . It is clear that it was aimed not at legitimate business organizations but at combatting 'a society of criminals who seek to operate outside of the control

of the American people and the governments.' There is no question that defendant cannot be so characterized.

Assuming that plaintiffs' allegations have merit, the most that can be said is that defendant's transactions, on this occasion, have been illegal.

*Barr v. WUI/TAS, Inc.*, 66 F.R.D. at 113.

Here, too, all that can be said is that if plaintiffs' allegations have merit, then defendants engaged in fraudulent conduct in the sale of real estate. If that should be the case, plaintiffs are able to state causes of action under the federal Securities and Interstate Land Sales Acts. They, therefore, have at their disposal laws specifically designed to remedy fully the injuries they claim to have suffered. There is no justification for resort to the drastic and unique remedies utilized by Congress in response to a specific and different problem.

### b. The 12(2) Claim.

■ In Count III, plaintiffs purport to state a cause of action under § 12(2) of the Securities Act, 15 U.S.C. § 77*l* against defendants. In their *ad damnum*, plaintiffs seek a judgment "entered in their favor and against all defendants, jointly and severally for all amounts paid to the defendants, including amounts paid to the Colorado City Municipal District and its predecessor, plus interest at the statutory rate." The complaint also seeks punitive damages in an amount double the compensatory damages. (Complaint at 17.)

Defendants make three challenges to the complaint, as drafted. First, citing *Avern Trust v. Clarke*, 415 F.2d 1238, 1242 (7th Cir. 1969), they claim that no punitive damages are awardable under the Securities Act of 1933. In their responsive memorandum, plaintiffs concede this point, as well as the fact that punitive damages are unavailable under § 10(b) of the Exchange Act.

*Globus v. Law Research Service, Inc.*, 418 F.2d 1276 (2d Cir. 1976). Accordingly, on the court's own motion, the motions to dismiss the punitive damages prayers will be treated as motions to strike under Federal Rule 12(f) and granted.

■ Defendants also seek dismissal of Count III on the ground that the complaint fails to allege that plaintiffs have "tendered" their securities. There can be no doubt that tender is, at some point, a prerequisite to recovery under § 12(2). *Wigand v. Flo-Tek, Inc.*, 609 F.2d 1028, 1034 (2d Cir. 1979). The statute, however, is silent as to the timing of the required tender and the federal courts have expressed diverging views on this problem. Most courts which have considered the problem have held that an offer to tender contained in the complaint satisfies the requirements of the Act. *Wigand v. Flo-Tek, Inc., supra* at 1034; *Chapman v. Dunn*, 414 F.2d 153 (6th Cir. 1969); *Stadia Oil & Uranium Co. v. Wheelis*, 251 F.2d 269 (10th Cir. 1957). In light of the purposes of the tender requirement—to put the parties in the status quo—this court agrees with these views. Unfortunately, the complaint contains no offer to tender the securities, nor does it contain an express demand for "recission" from which such an offer may be implied. Accordingly, Count III is dismissed with leave to amend to allege an offer to tender in the 12(2) claim. *Billet v. Storage Technology Corp.*, 72 F.R.D. 583 (S.D.N.Y.1976).

The same action is taken with respect to the third alleged defect in the complaint—the failure to allege compliance with the one year statute of limitations of the Securities Act, 15 U.S.C. § 77m.[13] It has been repeatedly held that compliance with the one-year provision of the Securities Act, in contrast to other limitations statutes, is an essential element of a cognizable 12(2) claim. Thus, unlike other situations, com-

---

**13.** Section 13 of the Securities Act, 15 U.S.C. § 77m, provides, in pertinent part:

No action shall be maintained to enforce any liability created under section ... 77*l*(2) [§ 12(2)] of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence .... In no event shall any such action be brought to enforce a liability created ... under section 77*l*(2) of this title more than three years after the sale.

pliance with the statute must be affirmatively pleaded in 12(2) actions and is not merely an affirmative defense to be raised by defendants. *McMerty v. Burtness*, 72 F.R.D. 450 (D.Minn.1976); *Ingenito v. Bermec Corp.*, 376 F.Supp. 1154 (S.D.N.Y.1974); *In re Ceasars Palace Securities Litigation*, 360 F.Supp. 366 (S.D.N.Y.1973); *Newberg v. American Dryer Corp.*, 195 F.Supp. 345 (E.D.Pa.1961).

The Second Amended Complaint, like its predecessors, fails to specify when each plaintiff purchased his lots pursuant to the prospectus for Colorado City. As such, the complaint fails to "affirmatively allege" compliance with the limitations period. Accordingly, Count III of the complaint is dismissed with leave to amend. Such amendment should include an indication of when the plaintiffs purchased their property, or alternatively, facts sufficient to support an argument that the limitations period was tolled so that the claims are not time-barred. *In re Home-Stake Production Co. Securities Litigation*, 76 F.R.D. 337 (D.Okla.1975).

### c. Interstate Land Sales Full Disclosure Act Claims.

As an alternative remedy to the Securities laws, Counts IV and V of the complaint have been brought under the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1701 *et seq.* Defendants have moved to dismiss both counts on the ground that they are inadequately pleaded. More particularly, defendants claim that, because plaintiffs failed to specify the dates in which they purchased their property in the complaint, they have failed to affirmatively allege compliance with the applicable two and three years statutes of limitations in 15 U.S.C. § 1711. Defendants also contend that since the Act became effective in 1969 and has no retrospective application, *see, Davis v. Rio Rancho Estates, Inc.*, 401 F.Supp. 1045, 1048 (S.D.N.Y.1975), it is impossible to determine whether the sales complained of here fall within the coverage of the Act. Accordingly, defendants seek to dismiss the claims or move for a more definite statement.

As to the latter argument, the court agrees with defendants to the extent that it recognizes that, at some point in this'litigation, defendants are entitled to know when plaintiffs purchased their lots. Theoretically, this information could as easily be acquired through interrogatory answers as in the complaint. And in this sense, the issue of whether the lots were purchased prior to the effective date of the Act could be dealt with on a routine summary judgment motion. However, since the filing of an amended complaint is necessary for other reasons, plaintiffs are directed to include the date of purchase (or exchange) for each individual lot holder in Colorado City who is a plaintiff in this case as a prelude to the summary disposition of any claims relating to purchases prior to the effective date of the Act.

The absence of affirmative allegations as to the dates of purchases, however, does not defeat the complaint on statute of limitations grounds. Initially, the court notes that although there is limited authority for the contrary result, the rule in this district is that under the Interstate Land Sales Act, compliance with the statute of limitations need not be affirmatively pleaded in the complaint, but rather, like other defenses must be raised by a motion to dismiss. *Bongratz v. WL Belvidere, Inc.*, 416 F.Supp. 27 (N.D.Ill.1976). *See also, Melhorn v. Amrep Corp.*, 373 F.Supp. 1378, 1380 (M.D.Pa.1974).

Moreover, even assuming plaintiffs have the burden of affirmatively pleading the timeliness of their claims, they have adequately done so in the complaint. The plaintiffs' pleading alleges not only fraud in the initial sale of the lots, and sale without a conforming registration statement with HUD, but a series of continuing frauds aimed at inducing plaintiffs to continue to make payments on their sales contract or additional purchases or exchanges. Taking these allegations as true, the situation is much the same as that considered by Judge Lasker in the Southern District of New York. In *Husted v. Amrep Corp.*, 429

F.Supp. 298 (S.D.N.Y.1977), the court noted that these allegations, if proved at trial, could either toll the running of the statute or establish a continuing series of "violations" of 15 U.S.C. § 1703 within two years of the filing of the complaint. Accordingly, here, as in *Husted*, the statute of limitations will not support a motion to dismiss. As such, defendants' motions to dismiss Counts IV and V are denied.

### d. Illinois Land Sales Act Claims.

■ Finally, in Count VI, plaintiffs assert a claim under the Illinois Land Sales Act ("ILSA"), Ill.Rev.Stat. ch. 30, § 371 *et seq.* Although they acknowledge that the Act does not expressly authorize their suit, plaintiffs contend that as "members of the class which the legislation is designed to protect" an implied private right of action may be inferred from the statute. This court cannot agree and thus Count VI also is dismissed.

Discerning whether implied private causes of actions exist in federal statutes is not a simple analytical task, and, given the trend of recent Supreme Court precedent, an increasingly fruitless one. *See e. g., Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). The problem here is even more complicated since as a federal court applying substantive state law, the court's inquiry not only involves statutory construction, but also prediction: what would Illinois' courts do in similar circumstances. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The task is further compounded by the lack of complete reports from the Illinois General Assembly. Any decision, therefore, must be based on inferences drawn from the structure of the statute itself with reference to guiding principles set forth by Illinois precedent.[14]

The Illinois statute at issue may be broadly characterized as "consumer protection" legislation. Its primary aim is to secure, for real estate purchasers, full disclosure of the material facts underlying the property they seek to buy. To this end the Act contains a comprehensive scheme of regulation under which a prospective subdivider, before offering land for sale, must register with the Illinois Department of Registration and Education. The required registration application must disclose information both about the subdivider and the property, including existing improvements such as roads, schools and local transportation facilities. The application must also include a proposed public property report, to be distributed to purchasers, with information concerning any encumbrances on the land and information concerning existing and proposed improvements.

The Act provides express protection for purchasers in several ways. First, the statute directs the Department of Registration and Education to investigate each subdivision and empowers the Department to make annual on-site inspections at the subdivider's expense. Engineering reports also are demanded of the seller. If the Department believes that the subdivider or his agents have violated any provision of the Act, or if the on-site inspection of the project discloses that the sales involve misrepresentations, fraud or deceit as to any purchaser, the Department may issue a cease and desist order. An administrative hearing would then follow under the statutory scheme.

Criminal penalties are also created under the legislation. Making or distributing false statements or misrepresentations concerning the land is a Class 4 felony, punishable by imprisonment and/or a $10,000 fine.

Although the primary focus of the statute is on its regulatory scheme with state

---

**14.** The fact that this court is called upon to determine state law may well be a factor that "counsels hesitation", *Bivens v. Six Unknown Named Federal Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), in discovering implied causes of action where Illinois explicitly created none. The distinction between "inter-preting" existing state law and "creating" new state policy is often difficult to discern. *See Johnson v. Nationwide Industries, Inc.*, 450 F.Supp. 948, 954 (N.D.Ill.1978). In any event, the argument against inferring a cause of action from the ILSA is compelling without considering comity concerns.

enforcement, the Act does provide certain remedies directly to the consumer. Unless a prospective purchaser receives a copy of the property report at least 48 hours in advance of the execution of the real estate sales agreement, the contract is voidable, at the purchaser's option, within 48 hours after the agreement is signed. Finally, purchasers are further protected by provisions which specify that if the subdivider sells a parcel subject to a mortgage, lien or other financial encumbrance, the subdivider must create an escrow, place the fee title in trust, post a bond with the state or demonstrate that the purchaser's rights are superior to the holders of any other interests in the property.

The Illinois Supreme Court, in construing a statute which provided a spectrum of consumer remedies comparable to those provided by the ILSA refused to infer a private cause of action. In *Hoover v. May Department Stores Co.*, 77 Ill.2d 93, 32 Ill. Dec. 311, 395 N.E.2d 541 (1979), plaintiffs sought to maintain an action under the Illinois Retail Installment Sales Act, Ill.Rev. Stat. ch. 121½, § 501 *et seq.* The *Hoover* court relied on the "totality of the circumstances", including the fact that similar consumer protection bills had expressly authorized private damage actions, and the inclusion of an "array of remedies" in the Retail Installment Sales Act in arriving at its conclusion. The court noted that "in other consumer-protection statutes the legislature, when it intended to create a private cause of action for violations, specifically created the right of action in the statute." 77 Ill.2d 93, 32 Ill.Dec. at 316, 395 N.E.2d at 546.

Virtually on all fours with the present case is the rejection of an implied private right of action under the Illinois Condominium Sales Act by both federal and state courts in this jurisdiction. The Condominium Act, like the ILSA, provides for comprehensive disclosures by the prospective sellers. Also, like the ILSA, the Condominium Act provides direct consumer remedies in the form of the option to void the sales agreement absent the requisite disclosures. In *Johnson v. Nationwide Industries, Inc.*,

450 F.Supp. 948, 954 (N.D.Ill.1978), the court declined to find an implied right of action in the Condominium Act. At least one Illinois court has found this conclusion persuasive and "decline[d] to expand the remedy afforded under the statute...." *Luster v. Jones*, 70 Ill.App.3d 1019, 27 Ill. Dec. 66, 388 N.E.2d 1029 (1979). These decisions lend great force to the arguments against "expanding the remedies" provided by the ILSA.

Finally, the legislative context in which the ILSA was enacted confirms that no private rights of action were contemplated. The bill that created the Illinois Land Sales Act in 1969 repealed its predecessor, the Installment Land Sales Act. The two laws contain parallel provisions, except that the present Act broadened the scope of regulation to include all sales from large out-of-state subdivisions, not just installment sales. The statutes include virtually identical criminal penalties and procedures for enforcement by the Department of Registration and Education. The present Act, however, contains the direct purchaser remedy not specified by its predecessor—the option with the purchaser to void the contract within 48 hours.

In addition, the present ILSA, in the form of House Bill No. 2557, was first introduced on April 28, 1969, less than one year after the August 1, 1968 enactment by Congress of the Interstate Land Sales Act. 15 U.S.C. § 1701 *et seq.* A comparison of the two statutes evinces substantial similarities between the two bills, both in form and substance. Both laws have similar reach, covering land "divided or proposed to be divided into 50 or more lots". The exclusion from the coverage of the respective bills also track each other. It strains credulity to conclude that when the Illinois General Assembly passed the ILSA it was not using the federal legislation as a reference. Yet the legislature failed to include the express authorization for civil damage actions contained in the federal law. The failure to so include these provisions, when considered against the background of the Interstate Land Sales Act, and comparable

Illinois consumer-protection legislation which expressly authorize such suits, cannot be considered inadvertent. Rather, the conclusion inures that the drafters of the ILSA did not intend to create a private right of action to purchasers, and as such, none can be inferred here for either compensatory or punitive damages.

## ON MOTION FOR RECONSIDERATION

Plaintiffs, purchasers of lots in Colorado City, Colorado, have moved for reconsideration of this court's dismissal of the Organized Crime Control Act ("OCCA" or "RICO") ("Count I"), in their Second Amended Complaint. By plaintiffs' own admission, their motion is "predicated principally" on the Supreme Court's decision in *United States v. Turkette,* —— U.S. ——, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), which was announced five days after the release of this court's initial Memorandum and Order. The motion for reconsideration is granted. For the reasons stated below, upon reconsideration, the Memorandum and Order of June 12, 1981 is affirmed.

The thrust of this court's reasoning in its dismissal of the RICO claim was as follows:

[I]t seems reasonably clear that the limit of the Act's application is to entities involved with "organized crime" or activities within the penumbra of that phrase. It is not necessary to define specifically "racketeering activity" to be confident that the OCCA will not admit of the use put to it by plaintiffs. There simply is no hint in the congressional proceedings that the Act was viewed as an alternative, and cumulative, remedy for private plaintiffs alleging securities fraud or misrepresentations in the context of real estate transactions.

*Adair v. Hunt International Resources Corporation,* at 747–748. Nothing articulated by the Supreme Court in *Turkette* warrants a change in that approach.

In *Turkette,* defendants were prosecuted under an indictment charging them with participation in a wholly illegitimate enterprise engaging, inter alia, in trafficking in illegal narcotics, arson, mail fraud, bribery of police officers and corruptly influencing judicial proceedings. *Turkette,* 101 S.Ct. at 2526. The Court of Appeals for the First Circuit set aside defendants' conviction under the RICO count in the indictment because the Act, according to the Court, was designed only "to protect legitimate commercial enterprises from the onslaught of racketeers." *United States v. Turkette,* 632 F.2d 896, 899 (1st Cir. 1980). The Supreme Court reversed, holding that the term "enterprise" encompassed both legitimate and wholly illegitimate enterprises.

It hardly bears mention that nothing articulated by the Court in *Turkette* directly controls any issue raised in this proceeding. More importantly, nothing in the *Turkette* opinion elicits, indirectly, significant doubt as to the correctness of the result reached on June 12, 1981. *Turkette* resolved an issue in which the courts of appeals had reached varying conclusions, namely, whether persons engaged in wholly criminal endeavors were subject to criminal prosecution under the Act. To be sure, *Turkette* may be characterized fairly as an expansive interpretation of an expansive statute.* But that construction is premised upon clear language in the statute bolstered by unambiguous references in the legislative history which confirm that Congress intended to enact an unprecedentedly broad remedial device to confront the problem of "organized" crime in the nation. The Supreme Court specifically noted that:

Congress was well aware of the fear that RICO would "move large substantive areas formerly totally within the police power of the State into the Federal realm." [Citations omitted]. In the face of these objections, Congress nonetheless proceeded to enact the measure, knowing it would alter somewhat the role of the Federal Government in the war against organized crime . . . .

*Turkette,* —— U.S. at ——, 101 S.Ct. at 2530.

Finally, in *Turkette,* the Supreme Court noted that the inclusion of illegitimate en-

---

* Indeed, this court previously has acknowledged the expansive sweep of the OCCA in a criminal context. *See United States v. Lavin,* 504 F.Supp. 1356 (N.D.Ill.1981).

terprises within the scope of the Act was necessary to achieve the clearly stated goal of the legislation. The Court found it was the "declared purpose" of the Congress, " 'to seek the eradication of organized crime in the United States ... by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime.' " *Turkette,* ── U.S. at ──, 101 S.Ct. at 2531. The consequence of a restrictive construction of the OCCA was, to the Court, "unacceptable." "Whole areas of organized criminal activity would be placed beyond the substantive reach of the enactment." *Turkette,* ── U.S. at ──, 101 S.Ct. at 2532.

In the present case there is no suggestion that defendants have engaged in a pattern of criminal racketeering. Indeed, there is not even any allegation of that matter. What is alleged is securities and land fraud of the type traditionally litigated in private civil actions. Similarly, there is no assertion that defendants are engaged in organized crime, or any activity of a similar nature. Hence, in this case, the dismissal of the civil RICO counts is not "unacceptable" in terms of effectuating the "declared purpose" of the Act. On that basis alone *Turkette* is distinguishable.

To the extent the Supreme Court addressed the question of civil remedies under RICO in *Turkette,* the Court's opinion supports the conclusion reached in this court's prior Memorandum and Order. With respect to the civil remedies provisions, the Court expressly linked the availability of those measures to the primary purposes of the Act.

> As a general proposition, however, *the civil remedies could be useful in eradicating organized crime from the social fabric,* whether the enterprise be ostensibly legitimate or admittedly criminal.

The Court commented further:

> In discussing these civil remedies, the Senate Report on the Organized Crime Control Act of 1970 specifically referred

to two state cases in which equitable relief had been granted against illegitimate enterprises. [Citation omitted]. *These references were in the context of a discussion on the need to expand the remedies* available *to combat organized crime.*

*Turkette,* ── U.S. at ── n.8, 101 S.Ct. at 2530 n.8 (emphasis added).

What the Supreme Court's discussion in *Turkette* suggests, and what is confirmed by the legislative history of the OCCA, is that the civil remedies provisions of RICO are derivative from the primary criminal enactments. It is not necessary to hold that prior criminal conviction is a prerequisite to civil actions under the OCCA, *see Parnes v. Heinold Commodities, Inc.,* 487 F.Supp. 645 (N.D.Ill.1980), to conclude that the civil remedies provisions cannot be cut loose from their moorings in a criminal statute and employed by private litigants in the context of an otherwise wholly traditional suit for fraud.** Stated succinctly, had Congress intended to turn all securities fraud actions into treble damage suits, it would have, at the very least, given some indication of that purpose. Accordingly, on reconsideration, the dismissal of Count I of the Second Amended Complaint is affirmed.

---

** Nor is proof that defendants are tied to "organized crime" required. *United States v.*

*Campanale,* 518 F.2d 352 (9th Cir. 1975).