**Murray H. KIMMEL, et al.**

v.

**Carl John PETERSON, et al.**

Civ. A. No. 82–2752.

United States District Court,
E.D. Pennsylvania.

May 9, 1983.

As Modified May 27, 1983.

David B. Zlotnick, Greenfield & Chimicles, P.C., Bala Cynwyd, Pa., for plaintiff.

Daniel Segal, Claire Rocco and Leslie Hayes, Goodman & Ewing, Philadelphia, Pa., for Carl John Peterson.

Melvin Simensky, Gersten, Scherer & Kaplowitz, New York City, David Braveman, Philadelphia, Pa., for Raymond and Jessie Dirks.

Raymond J. DeRaymond, Coffin, DeRaymond, Shipman, Stitt, Lewis & Walters, Easton, Pa., for Mario Andretti.

## MEMORANDUM

GILES, District Judge.

Various defendants have filed motions to dismiss the amended complaint in this action. For the reasons which follow, their motions shall be granted in part and denied in part.

This now complex securities fraud case had rather humble beginnings. On June 25, 1982, Murray Kimmel filed a four page, two count complaint against John Peterson, alleging a violation of section 10(b), Rule 10b–5 and common law fraud. However, this relative simplicity was short-lived. On September 10, 1982, an amended complaint was filed. Dr. Kimmel was joined by four other plaintiffs—his wife and children—in suing sixteen defendants. The amended complaint, stretching some thirty four pages, contains twelve counts which allege violations of sections 11, 12(2), 15 and 17(a) of the Securities Act of 1933, 15 U.S.C. § 77k, 77*l*(2), 77o, 77q(a) (1976), sections 10(b) and 20 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j; 78t (1976), as well as claims under the Racketeer Influenced and Corrupt Organizations Act of 1970 ["RICO"], 18 U.S.C. § 1961–68 (1976). Pendent state claims include common law fraud, misrepresentation, negligence, infliction of emotional distress, and a count under the Pennsylvania Securities Act, Pa. Stat.Ann. tit. 70 § 1–201 et seq. (Purdons 1982–1983 Supp.).

### I. FACTS

Taking as true the well-pled allegations in the complaint, as I must on a motion to dismiss,[1] the factual scenario giving rise to this litigation may be summarized as follows. Dr. Kimmel responded to an advertisement in a financial journal placed by Muir, an investment banking and brokerage firm.[2] He was contacted by defendant Peterson, one of Muir's brokers, and Dirks, a partner in and manager of Muir. Kimmel related that he had a thriving medical practice and wanted to make some prudent investments. As a busy physician, he had little time to follow the wanderings of the stock market. Therefore, he needed a broker upon whom he could rely heavily to choose investments. He emphasized that although he was seeking investments which would be profitable, they must be safe. Peterson and Dirks detailed their expertise in the area and assured him that all investments chosen would be thoroughly investigated to ensure their safety.

The fraudulent activities alleged fall into two related categories. The first involves the types of securities purchased by defendants. Despite Kimmel's admonitions, Peterson acquired highly speculative stock for the account. Many of the high risk purchases were new issues underwritten by Muir. Kimmel was often consulted and urged to purchase these securities on the basis of insufficient, false or misleading information. The prospectuses contained similarly deficient information, causing artificial overvaluation and thus manipulation of the market for these securities. In addition, Kimmel was advised to increase his holdings by purchasing stock on margin, without being apprised of the accompanying risks. In essence, Dirks and Peterson actively ignored Kimmel's wishes, utilizing his money to inure to the benefit of Muir.

The second category of alleged fraudulent transactions relates to the evolution of the relationship between Kimmel and Muir. On the advice of Peterson and Dirks, Kimmel became a subordinated creditor of Muir. Defendants continually tried to convince him that Muir was a safe investment, pointing to its famous general partners, such as Mario Andretti, Jimmy Connors and John Denver. When Peterson invited the Kimmel family to the Montreal Grand Prix, Mario Andretti was introduced as a general partner of Muir and did not protest or deny

---

1. See, e.g., Miree v. DeKalb County, 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 2492 n. 2, 53 L.Ed.2d 557 (1977); Rogin v. Bensalem Township, 616 F.2d 680, 685 (3d Cir.1980); Bogosian v. Gulf Oil Corp., 561 F.2d 434, 444 (3d Cir.1977).

2. Muir was a limited partnership which, according to the complaint, went into receivership in August of 1981. Amended Complaint ¶ 5.

the title.[3] Thereafter, Peterson and Dirks tried to persuade Kimmel to increase his holdings in Muir, again representing it to be a safe investment. This time, Kimmel became a limited partner with an investment of an additional $200,000. However, defendants did not disclose the risks inherent in this investment or the fact that Muir was fast becoming a vehicle for the underwriting of speculative new issues. The complaint further alleges a course of fraudulent conduct surrounding Kimmel's partnership interest in Muir, all revolving about the non-disclosure of crucial information on the firm's financial health. For example, it is alleged that a financial statement misrepresented Muir's status by failing to reflect the overvaluation of the new issues. An increased investment of $450,000.00 which was to be applied to Kimmel's subordinated loan was, without his knowledge, used to increase his partnership interest. Unfavorable publicity caused Kimmel to once again inquire into the safety of his investments. Even after Muir had called in the Securities and Exchange Commission, Peterson still insisted that all investments were safe. On August 17, 1981, Muir closed and a trustee was appointed. It was only then that Peterson advised Kimmel to remove his investments from Muir. However, by that point, he was unable to save his investments. Both Dirks and Peterson promised to reimburse Kimmel for part of his losses; however, both refused to put that promise in writing or honor it.

Although Peterson and Dirks allegedly were principally responsible for these events, many Muir associates and affiliates were also implicated. As a result of defendants' activities, the Kimmels lost their life savings and allegedly suffered tremendous mental anguish. In addition, the funds earmarked for their children's educations were lost.[4]

Peterson moves to dismiss, or in the alternative, for a more definite statement. In support of his motion, he raises four grounds: (1) the entire complaint lacks adequate specificity; (2) there is no private right of action under section 17(a) of the Securities Act of 1933; (3) the RICO count should be dismissed for failure to state a cause of action and (4) the count claiming infliction of emotional distress should also be dismissed for failure to state a cause of action. Raymond and Jessie Dirks move to dismiss, relying upon the grounds and arguments offered by Peterson. Mario Andretti also moves to dismiss for failure of the amended complaint to state a cause of action against him.

## II. DISCUSSION

### A. Overall Specificity

Peterson argues that the complaint lacks the specificity required under Rule 9(b) of the Federal Rules of Civil Procedure. In support of his claim that the complaint is so vague that it defies intelligent response, Peterson cites the absence of details surrounding each securities transaction. In addition, the complaint is assailed for its use of "information and belief" pleading. Plaintiffs counter, asserting that the complaint gives defendants adequate notice with sufficient detail to allow them to answer. Responding to the "information and belief" contention, plaintiffs argue that the matters are peculiarly within defendants' knowledge. Moreover, it is a "technical point of pleading," see Plaintiffs' Memorandum In Opposition to the Motion to Dismiss at 10, and plaintiffs offer to stipulate with defendants to remove the offending language and stand on their allegations in the complaint.

Rule 8(a) of the Federal Rules of Civil Procedure sets the general tone of the federal pleading rules. Unlike its pleading predecessors, the Federal Rules require only "a short and plain statement of the claim showing that the pleader is entitled to re-

---

**3.** During the period involved, from the summer of 1978 until 1981, Peterson and his associate Nancy Rochford, regularly entertained Dr. and Mrs. Kimmel to further cement their relationship of trust.

**4.** Defendants' had also convinced the Kimmels to make their children subordinated creditors of Muir as well.

lief." Fed.R.Civ.P. 8(a). Rule 9(b) articulates a stricter standard to be applied when alleging fraud. It requires "the circumstances constituting fraud ... [to] ... be stated with particularity." Fed.R.Civ.P. 9(b). Reconciling these two rules to strike a sound balance is not an easy task. *See Credit Finance Corp., Ltd. v. Warner & Swasey Co.,* 638 F.2d 563, 566 (2d Cir.1981); *Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, 378–80 (2d Cir.1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975). However, the oft quoted language from Wright and Miller endeavors to explore the rationale behind Rule 9(b): "[I]t is a serious matter to charge a person with fraud and hence no one is permitted to do so unless he is in a position and is willing to put himself on record as to what the alleged fraud consists of specifically." 5 C. Wright & A. Miller, *Federal Practice and Procedure,* § 1298 at 413 (1969) (footnotes omitted) *see Segal v. Gordon,* 467 F.2d 602, 607 (2d Cir.1972). In *Segal,* the Second Circuit attempted to articulate a standard, noting that "10b–5 violations will not pass scrutiny if they do not allege with some specificity the statements allegedly constituting fraud." 467 F.2d at 607. The court went on to note that "mere conclusory allegations ... are insufficient." *Id. Accord Decker v. Massey-Ferguson, Ltd.,* 681 F.2d 111, 115 (2d Cir.1982); *Mauriber v. Shearson/American Express, Inc.,* 546 F.Supp. 391, 393 (S.D. N.Y.1982); *Merrill Lynch, Pierce, Fenner & Smith v. Del-Valle,* 528 F.Supp. 147, 149 (S.D.Fla.1978). The pleading must apprise the defendants of the substance of plaintiffs' claim with sufficient detail to enable the defendants to answer. *See, e.g., Gottreich v. San Francisco Investment Co.,* 552 F.2d 866 (9th Cir.1977); *Landmark Savings & Loan v. Rhoades,* 527 F.Supp. 206, 207 (E.D.Mich.1981); *Beascoechea v. Sverdrup & Parcel Assoc., Inc.,* 486 F.Supp. 169, 174 (E.D.Pa.1980). However, this rule is not to be applied with draconian strictness. As the court in *Beascoechea,* noted, Rule 9(b) "must be read in conjunction with the liberal pleading rules, which eschew technicalities." 486 F.Supp. at 174. Similarly, in *Adair v. Hunt International Resources*

*Corp.,* 526 F.Supp. 736 (N.D.Ill.1981), after noting that Rules 8 and 9 are to be "read together," the court stated; "[w]ith these principles in mind, the purpose of Rule 9 becomes clear. Rule 9 lists the actions in which *slightly* more is needed for notice." 526 F.Supp. at 744 (quoting *Tomera v. Galt,* 511 F.2d 504, 508 (7th Cir.1975)) (emphasis in original).

█ After reviewing the amended complaint, I conclude that the dictates of Rule 9(b) have been satisfied. With respect to the purchase of securities, other than the interests in Muir, the complaint identifies the parties and their roles in the transactions involved. Dr. Kimmel's request for safe investments is emphasized and the repeated breaches of his trust are detailed. Specific acts of knowing misrepresentations and omissions are alleged. As defendant points out, the complaint does fail to describe each of the alleged transactions by date, name of stock, amount and purchase price. Defendant fears that the complaint "encompasses every single stock transaction engaged in by Kimmel from 1978 to August 1981." *See* Defendants' Memorandum in Support of the Motion to Dismiss at 12–13. This may well be the case. Yet, dismissal is not warranted. This case does not involve one or two or even ten isolated allegations of fraud, but rather over two years of continued fraudulent securities transactions. The complaint contains more than mere conclusory allegations of wrongdoing. It details a course of conduct during which defendants invested Dr. Kimmel's money for their own or Muir's benefit. Concerns over frivolous assertions of fraud, which originally prompted the enactment of Rule 9(b), do not apply here. Plaintiff has alleged far more than boilerplate claims of misrepresentation. The basic charge is very specific—managing Dr. Kimmel's entire investment portfolio in a manner involving great risk without his knowledge and against his express wishes. I find the complaint adequately places defendants on notice and allows them to respond.

From a practical standpoint, defendants have access to all of the records of the

transactions and can glean from them the information needed to respond. It is unclear whether plaintiffs have access to such detailed information and a plaintiff should not be precluded from suing if he or she does not. Fundamentally, although Rule 9(b) requires specificity, to demand this quantum of detail at this stage would totally undermine the letter and spirit of Rule 8(a) and the liberalized pleading envisaged under the Federal Rules of Civil Procedures.[5] Finally, assuming plaintiff does have access to the information, requiring amendment will accomplish little more than delay. Plaintiffs would add detail to the allegations and defendants would, in all probability, make the same denials as would be made without the added detail. Only through discovery will both sides gain the information required to assert their respective claims and defenses.

As regards the allegations surrounding the loans to and interest in Muir, their specificity is sufficient. The complaint sets out dates, the sums lent, the express representations made by defendants and why those representations were fraudulent.

Generally, allegations plead on "information and belief" do not satisfy the specificity requirements of Rule 9(b). 2A *Moore's Federal Practice* ¶ 9.03 (2d ed. 1982). However, the objective of this rule may be satisfied if the allegations are accompanied by a statement of the facts upon which the belief is founded, *see Schlick v.*

*Penn-Dixie Cement Corp.,* 507 F.2d 374, 379 (2d Cir.1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975). The rule may also be relaxed as to matters within the adverse party's knowledge, although some courts have required an accompanying statement of facts as well. *See Segal,* 467 F.2d at 608; *Arpet Ltd. v. Homans,* 390 F.Supp. 908, 913 (W.D.Pa.1975). The amended complaint does detail the factual allegations upon which the beliefs are grounded and much of the substance of the allegations is within defendants' knowledge. Moreover, plaintiffs have stated that they are willing to strike the offending language and stand on their allegations. Plaintiff's Memorandum in Opposition of the Motion to Dismiss at 10–11. In light of that concession, defendants' objections are moot. Since I conclude that the amended complaint in no way offends Rule 9(b), defendants' motion to dismiss on this ground shall be denied.

### B. *Section 17(a) of the Securities Act of 1933*

Plaintiffs' complaint contains a count brought under section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q (1976). Defendants argue that there is no private cause of action under that section and, as an unspoken corollary, urge that one should not be implied. Although the numerical weight of authority is in favor of implying a private right of action,[6] neither the Third

---

**5.** The Ninth Circuit eschewed an overly stringent reading of Rule 9(b) and expressed a similar concern over losing sight of the liberality of the pleading rules. In *Gottreich,* 552 F.2d 866 (9th Cir.1977) the court stated:

> Defendants say that an allegation that they knew that the representations were false is not the equivalent of an allegation that they were false. How could defendants know that they were false if they were not false? We had thought that this kind of nit-picking had disappeared in 1938, when the Federal Rules of Civil Procedure were first adopted.

552 F.2d at 867. Although I do not mean to suggest that defendants' contentions are along the same vein, the expressed concern over the Federal Rules is applicable to this case.

**6.** Of the courts of appeal to address the issue, four have implied a private right of action, *see*

*Stephenson v. Calpine Conifers II, Ltd.,* 652 F.2d 808, 815 (9th Cir.1981); *Lincoln National Bank v. Herber,* 604 F.2d 1038, 1040 n. 2 (7th Cir.1979); *Kirshner v. United States,* 603 F.2d 234, 241 (2d Cir.1978), *cert. denied, sub nom., Goldberg v. Kirshner,* 444 U.S. 995, 100 S.Ct. 531, 62 L.Ed.2d 426 (1979); *Newman v. Prior,* 518 F.2d 97, 99 (4th Cir.1975); two have refused to so do, *see Landry v. All American Assurance Co.,* 688 F.2d 381, 391 (5th Cir.1982); *Shull v. Dain, Kalman & Quail, Inc.,* 561 F.2d 152, 159 (8th Cir.1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978) and one appears undecided, leaning slightly toward joining the majority, *see Gutter v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 644 F.2d 1194, 1196 (6th Cir.1981), *cert. denied,* 455 U.S. 909, 102 S.Ct. 1256, 71 L.Ed.2d 447 (1982). However, the implied right of action under § 17(a) has not fared as well on the district

Circuit nor the Supreme Court has spoken. *See Aaron v. SEC,* 446 U.S. 680, 689, 100 S.Ct. 1945, 1951, 64 L.Ed.2d 611 (1980) (declining to rule on the issue); *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 733–34 n. 6, 95 S.Ct. 1917, 1924–25 n. 6, 44 L.Ed.2d 539 (1975) (same). This is a difficult issue, especially in light of the implication of a private right of action under section 10(b) on the one hand, and the Supreme Court's recent retrenchment from the implication of private remedies on the other. *See, e.g., Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 24, 100 S.Ct. 242, 249, 62 L.Ed.2d 146 (1979) (refusal to imply private remedy under section 206 of the Investment Advisors Act); *Touche Ross & Co. v. Redington,* 442 U.S. 560, 570–71, 99 S.Ct. 2479, 2486, 61 L.Ed.2d 82 (1979) (refusal to imply private right of action under section 17(a) of the Securities Exchange Act of 1934). *See also Walck v. American Stock Exchange, Inc.,* 687 F.2d 778, 780 (3d Cir.1982) (no implied right of action under sections 6 and 7 of the Securities Exchange Act of 1934). *But see Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 102 S.Ct. 1825, 1847–48, 72 L.Ed.2d 182 (1982) (private cause of action implied under the Commodities Exchange Act).[7]

■ A majority of the courts which have implied a private right of action under section 17(a) have done so with little discussion or analysis. In the first case to imply a private remedy, *Osborne v. Mallory,* 86 F.Supp. 869 (S.D.N.Y.1949), the court sim-

ply paralleled section 17(a) to section 10(b), deciding that if a private right existed under the latter, it should also exist under the former. 86 F.Supp. at 879. More recent decisions cite only to Judge Friendly's concurrence in *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833 (2d Cir.1968), *cert. denied, sub nom., Coates v. SEC,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), where he noted that although a private remedy was never intended, "there seemed little practical point in denying the existence of such an action under § 17 ... once it had been established ... that an aggrieved buyer has a private action under § 10(b) of the 1934 Act." 401 F.2d at 867. *See, e.g., Stephenson v. Calpine Conifers II, Ltd.,* 652 F.2d 808, 815 (9th Cir.1981); *Kirshner v. United States,* 603 F.2d 234, 241 (2d Cir.1978). In *Newman v. Prior,* 518 F.2d 97 (4th Cir. 1975), the Fourth Circuit concluded a private right of action should be implied by merely citing to an earlier case, *Johns Hopkins University v. Hutton,* 488 F.2d 912 (4th Cir.1973), which had *assumed* without discussion the existence of a private remedy. *Newman,* 518 F.2d at 99. In sharp contrast, many of those who refuse to imply a private right of action have written scholarly and persuasive opinions. *See, e.g., Landry v. All American Assurance Co.,* 688 F.2d 381 (5th Cir.1982); *Hill v. Der,* 521 F.Supp. 1370 (D.Del.1981); *Reid v. Mann,* 381 F.Supp. 525 (N.D.Ill.1974). On the basis of statutory construction and the superior reasoning of those courts who follow the minority rule, I decline to imply a private cause of action under section 17(a) of the 1933 Act.

court level. *See, e.g., Hill v. Der,* 521 F.Supp. 1370, 1378 (D.Del.1981); *Ingram Industries v. Nowicki,* 502 F.Supp. 1060, 1069 (E.D.Ky. 1980); *McFarland v. Memorex Corp.,* 493 F.Supp. 631, 652 (N.D.Cal.1980); *Martin v. Howard, Weil, Labouisse, Friedricks, Inc.,* 487 F.Supp. 503, 507 (E.D.La.1980); *Reid v. Mann,* 381 F.Supp. 525, 528 (N.D.Ill.1974); *Dyer v. Eastern Trust & Banking Co.,* 336 F.Supp. 890, 903 (D.Me.1971). *But see, Compito v. McManus, Longe, Brockwehl, Inc.,* 470 F.Supp. 986, 993 (N.D.N.Y.1979); *DeMarco v. Security Planning Service, Inc.,* 462 F.Supp. 1066, 1069 (D.Ariz.1978); *In re Gap Stores Securities Litigation,* 457 F.Supp. 1135, 1142 (N.D.Cal.1978). In this district a private right of action has been implied. *See, e.g., Engl v. Berg,* 511 F.Supp.

1146, 1151–52 (E.D.Pa.1981); *Wulc v. Gulf & Western, Ind.,* 400 F.Supp. 99, 103 (E.D.Pa. 1975); *B & B Investment Club v. Kleinert's, Inc.,* 391 F.Supp. 720, 726 (E.D.Pa.1975). *See also Mifflin Energy Sources Inc. v. Brooks,* 501 F.Supp. 334, 336–37 (W.D.Pa.1980).

7. The trend away from implying private remedies can be witnessed outside the securities area. *See, e.g., Middlesex County Sewerage Authority v. National Sea Clammers Ass'n,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981); *California v. Sierra Club,* 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981); *Universities Research Ass'n, Inc. v. Coutu,* 450 U.S. 754, 101 S.Ct. 1451, 67 L.Ed.2d 662 (1981).

Before embarking on the familiar *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) analysis, a historical note will lend perspective to the issue. As one court observed: "the main reason for the somewhat awkward development of the law under § 17(a) of 1933 Act is the fact that it has traditionally lived in the shadow of another area of securities law: Rule 10b–5." *Landry,* 688 F.2d 381, 386 (5th Cir.1982). A private right of action was initially implied under section 10(b) of the Securities Exchange Act of 1934, and its implementing rule, 10b–5, 17 C.F.R. § 240.10b–5 (1982), in this district. *Kardon v. National Gypsum,* 69 F.Supp. 512, 513–14 (E.D.Pa.1946). For several decades thereafter, the parameters of this cause of action were defined largely by the lower federal courts. *See generally, Wachovia Bank and Trust Corp. v. National Student Marketing Co.,* 650 F.2d 342, 351 and 351 n. 20 (D.C.Cir.1980), *cert. denied,* 452 U.S. 954, 101 S.Ct. 3098, 69 L.Ed.2d 965 (1981). When the Supreme Court finally considered the issue, it affirmed the implication of a private right of action without much discussion. *See Superintendent of Insurance v. Bankers Life & Cas. Co.,* 404 U.S. 6, 13 n. 9, 92 S.Ct. 165, 169 n. 9, 30 L.Ed.2d 128 (1971). However, the Supreme Court later characterized this decision as mere acquiescence to a twenty-five year tradition established by the lower federal courts. *See Cannon v. University of Chicago,* 441 U.S. 677, 690–93 n. 13, 99 S.Ct. 1946, 1954–55 n. 13, 60 L.Ed.2d 560 (1979); *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 730, 95 S.Ct. 1917, 1922, 44 L.Ed.2d 539 (1975). Therefore, the private remedy under section 10(b) was essentially thrust upon a Court unwilling to overturn twenty-five years worth of precedent.

Until recently, section 10(b) was an extremely broad remedy—lacking the internal restrictions found in the express remedy provisions.[8] The judicially evolved cause of action was even being utilized as a vehicle for the redress of breaches of state-created fiduciary duties. *See Superintendent of Insurance,* 404 U.S. at 10–12, 92 S.Ct. at 167–68. However, the Supreme Court intervened and began to narrow the scope of the remedy. In *Blue Chip Stamps,* the Court ruled that an individual must be either a purchaser or seller of securities in order to have standing under section 10(b).[9] 421 U.S. at 754–55, 95 S.Ct. at 1934. In *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), the Supreme Court ruled that essentially state created causes of action for mismanagement and other breaches of fiduciary duties were not cognizable under section 10(b). *Santa Fe,* 430 U.S. at 477, 479–80, 97 S.Ct. at 1302, 1304. Perhaps most importantly, *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 201, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668 (1976) added a scienter requirement to the section 10(b) cause of action.[10] As it has now become more difficult to state a cause of action under section 10(b), plaintiffs are turning increasingly to the heretofore ignored anti-fraud provisions of section 17(a). Section 17(a) is not limited to fraud in the

---

**8.** For example, sections 11 and 12 of the 1933 Act are subject to the statute of limitations contained in section 13. As an implied cause of action, there is no statutory statute of limitations for actions brought under section 10(b). The most nearly analogous state statute applies, which is often longer than the period found in section 13.

**9.** By its very language, section 17(a) is broader than section 10(b), as it encompasses fraud in the "offer" or "sale" of securities, rather than just fraud in the purchase or sale.

**10.** In *Herman & MacLean v. Huddleston,* —— U.S. ——, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) the Supreme Court reiterated the logic employed in *Ernst & Ernst.* The coverage of section 10(b), because of its broad language, necessarily overlaps with some of the express remedies granted in the Securities Act of 1933, specifically section 11. Section 11, which can be triggered by negligent conduct, has certain procedural safeguards, such as a set statute of limitations and a bond for costs provision. Section 10(b) lacks these procedural obstacles. Thus, were 10(b) to cover negligent actions, section 11 and its procedures would be rendered superfluous, "thereby nullify[ing] the effectiveness of the carefully drawn procedural restrictions on these express actions." *Herman,* —— U.S. at ——, 103 S.Ct. at 688 (quoting *Ernst and Ernst,* 425 U.S. at 210, 96 S.Ct. at 1389). This statutory analysis is applicable to section 17(a) as well.

purchase or sale of securities, *see* note 9 *supra*. Most importantly, it appears that scienter is not required to state a cause of action under section 17(a)(2) or (a)(3). In *Aaron v. SEC*, 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980), in the context of an SEC enforcement action, the Court held that scienter was required under section 17(a)(1), but not under subsections (a)(2) or (a)(3). 446 U.S. at 697, 100 S.Ct. at 1956. It is, as the *Landry* Court noted; "doubtful that a different interpretation would be given if an implied private cause of action is found to exist," 688 F.2d at 387. *Compare Aaron v. SEC*, 446 U.S. at 695, 100 S.Ct. at 1955. (scienter required in SEC injunctive suit under Rule 10b–5) *with Ernst & Ernst*, 425 U.S. at 201, 96 S.Ct. at 1384 (scienter required in private cause of action under 10b–5). Thus, the implication of a private right of action under section 17(a) would allow and encourage the total circumnavigation of the new restrictions the Court has placed on a section 10(b) cause of action.[11]

Section 17(a) provides:

(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

    (1) to employ any device, scheme, or artifice to defraud, or

    (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

    (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q (1976). This anti-fraud provision is found in the Securities Act of 1933, flanked by the express private remedy provisions of sections 11 and 12. The latter provisions are complex and carefully crafted, containing internal defenses and restrictions unknown to section 17(a). For example, although section 11 is triggered by negligent conduct, a potential defendant, other than the issuer, is granted a "due diligence" defense. Section 11(b), 15 U.S.C. § 77k(b) (1976). In addition, a defendant may be absolved of liability under section 11(a) if it can be proven that the plaintiff knew about the misstatement or omission. 15 U.S.C. § 77k(a). The same is true under section 12(2) and liability thereunder is limited to the victim's immediate seller. Section 12(2) also contains a due diligence defense. 15 U.S.C. § 77*l*. By contrast, section 17(a) is written as an absolute liability provision and its language is sufficiently broad to encompass all of the behavior addressed by sections 11 and 12.

In determining whether to imply a private right of action, the touchstone is Congressional intent—"not whether this court thinks it can improve upon that statutory scheme that Congress enacted into law." *Touche-Ross & Co. v. Redington*, 442 U.S. 560, 578, 99 S.Ct. 2479, 2490, 61 L.Ed.2d 82 (1979). *See also Walck v. American Stock Exchange, Inc.*, 687 F.2d 778, 782 (3d Cir. 1982). In order to divine this Congressional intent, the Court established a four prong analysis in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). This analysis asks:

First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted,"—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And

---

11. Many lower courts have developed interesting solutions to this perceived procedural escapism. *See, e.g., Feldman v. Simkins Industries, Inc.,* 679 F.2d 1299, 1305 (9th Cir.1982) (under section 17(a)) must prove scienter or a duty to disclose non-public information); *Collins v. Signetics Corp.,* 443 F.Supp. 552, 555 (E.D.Pa.1977) (implied right of action under section 17(a) subject to limitations found in section 12(2) of the 1933 Act).

finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

422 U.S. at 78, 95 S.Ct. at 2088 (citations omitted). The Court in *Redington* indicated that while all four factors are relevant, they are not accorded equal weight. The first three, which more directly impact upon Congressional intent, are more important. *Redington,* 442 U.S. at 575–76, 99 S.Ct. at 2488–89.

By proscribing fraudulent activities in the offer or sale of securities, section 17(a) was obviously enacted to prevent fraud, thus protecting potential victims. *Accord Hill v. Der,* 521 F.Supp. 1370, 1376 (D.Del. 1981). *See also Transamerica,* 444 U.S. at 24, 100 S.Ct. at 249 (section 206 of Investment Advisors Act, worded much like section 17(a), designed to benefit a particular class); *Walck v. American Stock Exchange, Inc.,* 687 F.2d 778, 783 (3d Cir.1982) (section 6 of the 1934 Act, setting registration standards for securities exchanges, was enacted to protect investors). In *United States v. Naftalin,* 441 U.S. 768, 99 S.Ct. 2077, 60 L.Ed.2d 624 (1979), the Court reviewed the legislative history behind section 17(a) and concluded that its purpose was "to protect the investing public and honest business...." 441 U.S. at 775–76, 99 S.Ct. at 2082 (quoting S.Rep. No. 47, 73d Cong., 1st Sess., 1 (1933)). *Accord, Reid v. Mann,* 381 F.Supp. 525, 526 (N.D.Ill.1974). Thus, I find that the first prong of the *Cort* test is satisfied—plaintiff, as an investor, is a member of the class "for whose especial benefit the statute was enacted." [12] However, "the mere fact that the statute was designed to protect [investors] does not require the implication of a private cause of action for damages on their behalf ..." *Walck,* 687 F.2d at 783–84 (quoting *Transamerica Mortgage Advisors v. Lewis,* 444 U.S. 11, 24, 100 S.Ct. 242, 249, 62 L.Ed.2d 146 (1979) (citations omitted)).

The second factor under *Cort* is whether there is any legislative intent to create or deny a cause of action. The legislative history of the 1933 Act indicates that sections 11 and 12 were perceived as the only civil liability provisions of the statute. *See SEC v. Texas Gulf Sulphur,* 401 F.2d 833, 867 (2d Cir.), *cert. denied sub nom., Coates v. SEC,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1968) (Friendly, J., concurring) (citing H.Rep. No. 85, 73d Cong., 1st Sess. 9–10 (1933)). *Accord, Landry,* 688 F.2d at 389 and n. 35; *Dyer v. Eastern Trust and Banking Co.,* 336 F.Supp. 890, 904–05 (D.Me.1971); Ruder, *Civil Liability Under Rule 10b–5: Judicial Revision of Legislative Intent,* 57 Nw.U.L.Rev. 627, 656–57 (1963). In addition, the existence of express remedies within the same statute militates against a finding of Congressional intent to imply further remedies. *See, e.g., Middlesex County Sewerage Authority v. National Sea Clammers Ass'n,* 453 U.S. 1, 14–15, 101 S.Ct. 2615, 2623, 69 L.Ed.2d 435 (1981); *Transamerica,* 444 U.S. at 19–21, 100 S.Ct. at 246–47; *Redington,* 442 U.S. at 571–74, 95 S.Ct. at 2486–88; *Walck,* 687 F.2d at 784. This is especially true here, as section 17(a) is sufficiently broad to cover virtually all activities addressed by sections 11 and 12. As mentioned earlier, however, section 17(a) does not have the internal restrictions and defenses found in sections 11 and 12. [13]

---

**12.** In *Landry,* the Fifth Circuit found the first prong of *Cort* wanting, as "the statutory language does not suggest a private cause of action." 688 F.2d at 389. The provision is only "a general censure of fraudulent practices." *Id.* This argument is specious. A statute which lacks an express cause of action will rarely have language which "suggests a private cause of action." That the provision is a general proscription does not impact upon whether it was intended to protect a certain group of people. The mere fact that someone can be enjoined or criminally punished under section 17(a) inures to the benefit of potential victims. Finally, this conclusion ignores the Supreme Court's ruling to the contrary in *Naftalin.*

**13.** Section 13 is the statute of limitations section that applies to sections 11 and 12. See note 8 *supra.* Professor Loss notes that to allow an implied cause of action 17(a) would be "to attribute to Congress the rather elaborate intention that a purchaser may avoid the statute of limitations prescribed in § 13, as well as the possibility of having to post security for costs and perhaps the necessity of proving his

Thus, if a private right of action were to be implied under section 17(a), it would become the preferable remedy, rendering sections 11 and 12 entirely superfluous. The complex scheme which Congress wove in the express civil liability sections would be totally undermined. As the Court noted in *Redington,* it is "reluctant to imply a cause of action in § 17(a) that is significantly broader than the remedy that Congress chose to provide." 442 U.S. at 574, 95 S.Ct. at 2488. Along the same lines, in *Reid v. Mann,* 381 F.Supp. 525 (N.D.Ill.1974) the Court noted that "[to] impose a greater responsibility [than that provided by §§ 11 and 12] . . . would unnecessarily restrain the conscientious administration of honest business with no compensating advantage to the public." 381 F.Supp. at 526 (quoting *Texas Gulf Sulphur,* 401 F.2d at 867 (Friendly, J., concurring)). This same reasoning led the Supreme Court to require scienter under section 10(b), which again lacks the procedural barriers written into sections 11 and 12. A negligence standard under section 10(b) would similarly eviscerate the structure of the express liability sections, as plaintiffs would always prefer the former to the latter.[14] *See* note 10 *supra.* As noted earlier, if *Aaron v. SEC* is any indicator, scienter will not be required under section 17(a)(2), and (a)(3). There-

fore, the implication of a private remedy under section 17(a) would also undermine the Supreme Court's efforts to narrow the scope of a section 10(b) cause of action. The barriers placed around section 10(b) were established, at least in part, to save the remaining vitality of sections 11 and 12. *See Herman,* —— U.S. at ——, 103 S.Ct. at 688; *Ernst & Ernst,* 425 U.S. at 210, 96 S.Ct. at 1389. Thus, the implication of a private cause of action under section 17(a) would not only write sections 11 and 12 out of the statute, but would also render meaningless the Supreme Court's efforts in 10(b) area.

Interestingly, the language of section 17(a) is very similar to section 206 of the Investment Advisors Act of 1940, a provision under which the Supreme Court refused to imply a private right of action. *See Transamerica,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979). There, the Court decided that the second prong of *Cort* was not satisfied, noting that the provision was proscriptive and was not intended to create civil liabilities. *Id.* at 19, 100 S.Ct. at 246. Since Congress had provided other judicial and administrative methods for enforcing section 206, the Court stated it was "highly improbable that Congress absentmindedly forgot to mention an intended private ac-

own lack of knowledge of the falsity as in § 12(2) . . ." 3 L. Loss, Securities Regulation at 1786 (2d ed. 1961) [hereinafter cited as Loss].

14. While discussing the propriety of implying a private remedy under section 10(b), Professor Loss explained the interrelationship of all of the statutory provisions:

The question is simply whether there is the same justification for implying such liability under the 1933 act as there is under the 1934 act. It is one thing to imply a private right of action under § 10(b) or the other provisions of the 1934 act, because the specific liabilities created by §§ 9(e), 16(b) and 18 do not cover all the variegated activities with which that act is concerned. But it is quite another thing to add an implied remedy under § 17(a) of the 1933 act to the detailed remedies specifically created by §§ 11 and 12. The 1933 act is a much narrower statute. It deals only with disclosure and fraud *in the sale of securities.* It has but two important substantive provisions, §§ 5 and 17(a). Non-compliance with § 5 results in civil liability under

§ 12(1). Faulty compliance results in liability under § 11 and § 17(a) has its counterpart in § 12(2). It all makes a rather neat pattern. Within the area of §§ 5 and 17(a), §§ 11 and 12 (unlike §§ 9(e), 16(b) and 18 of the 1934 act) are all embracing. This is not to say that the remedies afforded by §§ 11 and 12 are complete. But the very restrictions contained in those sections and the differences between them—for example, the fact that § 11 but not § 12 imposes liability on certain persons connected with the issuer without regard to their participation in the offering and the fact that § 12(2) does not go so far in relation to § 17(a) and § 12(1) goes in relation to § 5—make it seem the less justifiable to permit plaintiffs to circumvent the limitations of § 12 by resort to § 17(a). Particularly is this so in view of the fact that § 11, together with the statute of limitations in § 13, was actually tightened in the 1934 amendments to the Securities Act.
Loss at 1785.

tion." *Id.* at 20, 100 S.Ct. at 247. This applies with stronger force here, where Congress has indeed provided an explicit private remedy. The Court remarked that "obviously, then, when Congress wished to provide a private damage remedy, it knew how to do so and did so expressly." *Id.* at 21, 100 S.Ct. at 247.

Nor is the third prong of *Cort* met, which requires consistency with the underlying purposes of the statutory scheme. In *Piper v. Chris-Craft Industries,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), the court phrased the inquiry in terms of whether the legislative purposes "are likely to be undermined absent private enforcement" or whether it "is necessary to effectuate Congress' goals." 430 U.S. at 25, 26, 97 S.Ct. at 941. Measured against any of those standards, an asserted private right of action under section 17(a) fails. Rendering sections 11 and 12 effectively impotent is neither necessary to, nor consistent with, the legislative purposes of the 1933 Act. In those sections, Congress accorded aggrieved individuals private remedies, limiting these remedies as it saw fit. The broader sweeping provisions of section 17(a) were meant to be used and are still available for purposes of SEC enforcement.

In light of the foregoing conclusions respecting the first three parts of the *Cort* test, analysis of the fourth and least important element is not necessary. Being convinced that Congress did not intend section 17(a) to be used as a private remedy, I must respect that intent.[15] Hence, the count of

---

**15.** Many of the same arguments could be made as regards the implication of a private right under section 10(b). The arguments would not be as persuasive, however. As Professor Loss pointed out, the express remedies in the 1934 Act are not as broad as in the 1933 Act. *See* note 14 *supra.* Thus, there is arguably more need for a private action under section 10(b). The fact that a private right of action has been implied thereunder is not a determining factor. As noted earlier, the section 10(b) right of action was essentially thrust on the Supreme Court, which like many of the lower federal courts, accepted its existence without much analysis. *See Redington,* 442 U.S. at 577–78 n. 19, 99 S.Ct. at 2489–90 n. 19; *Hill v. Der,* 521 F.Supp. at 1378 n. 4.

the complaint purporting to assert a claim thereunder shall be dismissed.

## C. THE RICO COUNT

Defendants move to dismiss Count VI of the amended complaint which asserts a civil claim under the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO"), 18 U.S.C. § 1961–1968 (1976). Plaintiffs seek to recover treble damages under the statute's civil remedy provision, 18 U.S.C. § 1964(c). Defendants rest their contention that the complaint fails to state a cause of action on four grounds: (1) use of RICO in the absence of any alleged link to organized crime contravenes the statute's purpose; (2) the complaint fails to adequately allege injury "by reason of" a violation of 18 U.S.C. § 1962; (3) the complaint does not distinguish the "enterprise" from the "pattern of racketeering activity" and (4) the complaint does not state a violation of 18 U.S.C. § 1962(a) against defendant Peterson.

### 1. *The Statute*

RICO was enacted as Title IX of the Organized Crime Control Act of October 15, 1970, Pub.L. No. 91–452, 84 Stat. 922 (1970). It represents the culmination of two decades of inquiry into potential solutions to the pervasive problem of organized crime.[16] The statute was envisaged as a much needed weapon with which to battle organized crime's infiltration into legitimate business. As Congress stated in its findings:

---

**16.** The infiltration of organized crime into legitimate business was isolated by the Kefauver Committee as early as 1951. The McClellan Committee documented the infiltration of labor unions and the existence of "La Cosa Nostra." The problem was also studied in 1967 by the President's Commission on Law Enforcement and Administration of Justice. *See generally,* Blakey & Gettings, Racketeer Influenced and Corrupt Organizations (RICO): Basic Concepts—Criminal and Civil Remedies, 53 Temp. L.Q. 1009, 1014–15 (1980). For an exhaustive legislative history of RICO, *see* Blakey, The RICO Civil Fraud Action in Context: Reflections on *Bennett v. Berg,* 58 Notre Dame L.Rev. 237, 249–80 (1982). [Hereinafter cited as *Blakey*].

The Congress finds that (1) organized crime in the United States is a highly sophisticated, diversified, and widespread activity that annually drains billions of dollars from America's economy by unlawful conduct and the illegal use of force, fraud, and corruption; (2) organized crime derives a major portion of its power through money obtained from such illegal endeavors as syndicated gambling, loan sharking, the theft and fencing of property, the importation and distribution of narcotics and other dangerous drugs, and other forms of social exploitation; (3) this money and power are increasingly used to infiltrate and corrupt legitimate business and labor unions and to subvert and corrupt our democratic processes; (4) organized crime activities in the United States weaken the stability of the Nation's economic system, harm innocent investors and competing organizations, interfere with free competition, seriously burden interstate and foreign commerce, threaten the domestic security, and undermine the general welfare of the Nation and its citizens; and (5) organized crime continues to grow because of defects in the evidence-gathering process of the law inhibiting the development of the legally admissible evidence necessary to bring criminal and other sanctions or remedies to bear on the unlawful activities of those engaged in organized crime and because the sanctions and remedies available to the Government are unnecessarily limited in scope and impact.

It is the purpose of this Act to seek the eradication of organized crime in the United States by strengthening the legal tools in the evidence-gathering process, by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime.

Pub.L. No. 91–452, 84 Stat. 922, title IX § 1 (1970). The result is a sweeping statute with a whole panoply of procedural tools to aid law enforcement officials, as well as a civil treble damage provision.

Under RICO, engaging in a "pattern of racketeering" within the confines of an "enterprise" becomes an offense separate from the predicate violations. To understand the structural mechanism of RICO, some definitions are in order. Section 1961(1) defines "racketeering activity" as specified state law offenses punishable by incarceration for more than one year, as well as any violation of a long list of federal statutes. A "pattern of racketeering activity" is defined as the commission of at least two predicate acts within ten years. 18 U.S.C. § 1961(5). The statutory definition of "enterprise" is broad enough to encompass just about any group of individuals. 18 U.S.C. § 1961(4). However, it is section 1962 which actually sets out the proscribed activities. It provides in pertinent part:

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in or the activities of which affect interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity of the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

(b) It shall be unlawful for any person through a pattern of racketeering activi-

ty or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962 (1976).

■ In addition to criminal remedies, RICO provides a private right of action for "any person injured in his business or property by reason of a violation of section 1962." Treble damages attach to a RICO verdict as well. 18 U.S.C. § 1964(c). However, the civil plaintiff is not required to prove a prior conviction, *see, e.g., Usaco Coal Co. v. Carbomin Energy, Inc.,* 689 F.2d 94, 95 n. 1 (6th Cir.1982); *Mauriber v. Shearson/American Express, Inc.,* 546 F.Supp. 391, 396 (S.D.N.Y.1982); *State Farm Fire & Cas. Co. v. Estate of Caton,* 540 F.Supp. 673, 675–77 (N.D.Ind.1982); *Glusband v. Benjamin,* 530 F.Supp. 240, 241 (S.D.N.Y.1981); *Heinold Commodities, Inc. v. McCarty,* 513 F.Supp. 311, 314 (N.D.Ill. 1979), and must only prove the statutory elements of a cause of action by a preponderance of the evidence, *see United States v. Cappetto,* 502 F.2d 1351, 1357 (7th Cir. 1974); *Parnes v. Heinold Commodities, Inc.,* 487 F.Supp. 645, 647 (N.D.Ill.1980); *Farmers Bank of Delaware v. Bell Mortgage Company,* 452 F.Supp. 1278, 1280 (D.Del. 1978). Finally, in interpreting and applying all of RICO's provisions, Congress has dictated that the statute "shall be liberally construed to effectuate its remedial purposes." Pub.L. No. 91–452, 84 Stat. 922, title IX § 904(a) (1970).

### 2. Connection With Organized Crime

■ Resting on RICO's articulated purpose, defendants argue that the failure of the complaint to allege any link to organized crime is fatal to plaintiffs' claim. Citing *United Steelworkers of America v. Weber,* 443 U.S. 193, 201, 99 S.Ct. 2721, 2726, 61 L.Ed.2d 480 (1979), defendants contend that although the claim may be within the letter of the statute, it does not fall within its spirit. Defendant's Memorandum in Support of their Motion to Dismiss at 39. Implicit within defendants' position is the notion that the RICO treble damage provision was not intended to be used to supplant or supplement the already extant remedies under the federal securities laws. This argument, limiting RICO to the organized crime context, has a facial appeal and has garnered some judicial support. *See, e.g., Wagner, et al. v. Bear, Stearns & Co., et al.,* [Current] Fed.Sec.L.Rep. (CCH) ¶ 99,-032 at 94,913 (N.D.Ill.1982) (RICO not intended to apply to securities fraud cases in absence of any nexus to organized crime); *Noonan v. Granville-Smith,* 537 F.Supp. 23, 29 (S.D.N.Y.1981) (same); *Waterman Steamship Corp. v. Avondale Shipyards, Inc.,* 527 F.Supp. 256, 260 (E.D.La.1981) (no cause of action under RICO for failed couplings installed on ships absent link to organized crime); *Adair v. Hunt International Resources Corp.,* 526 F.Supp. 736, 747–48 (N.D.Ill.1981) (land sale scam, while technically within the ambit of RICO, should not be accorded a cause of action without involvement of organized crime); *Barr v. WUI/TAS, Inc.,* 66 F.R.D. 109, 112–13 (S.D. N.Y.1975) (price fixing did not state a cause of action without organized crime involvement). However, defendants' purported allegiance to the purpose of the statute ignores both the language of RICO and its legislative history.

Congress clearly intended RICO to be applicable in the securities fraud area in certain situations as one of the predicate offenses listed is "fraud in the sale of securities." 18 U.S.C. § 1961(1)(D). The more fundamental issue presented here is whether RICO was intended to apply to *any* predicate offense in the absence of some allegation of the involvement of organized crime. The overwhelming majority of courts to address this issue have concluded that RICO

was not intended to be, and should not be limited to, the organized crime context. *See e.g., Schacht v. Brown,* 711 F.2d 1343 at 1353 (7th Cir.1983); *Bennett v. Berg,* 685 F.2d 1053, 1063 (8th Cir.1982); *Cenco, Inc. v. Seidman & Seidman,* 1982 Fed.Sec.L.Rep. ¶ 98,615 at 93,057 (7th Cir. 1982); *United States v. Thordarson,* 646 F.2d 1323, 1328–29 n. 10 (9th Cir.) *cert. denied,* 454 U.S. 1055, 102 S.Ct. 601, 70 L.Ed.2d 591 (1981); *United States v. Uni Oil, Inc.,* 646 F.2d 946, 953 (5th Cir.1981), *cert. denied sub nom., Corbitt v. United States,* 455 U.S. 908, 102 S.Ct. 1254, 71 L.Ed.2d 446 (1982); *United States v. Aleman,* 609 F.2d 298, 303 (7th Cir.1979) *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *United States v. Forsythe,* 560 F.2d 1127, 1136 (3d Cir.1977); *United States v. Campanale,* 518 F.2d 352, 363 (9th Cir.1975); *cert. denied sub nom., Grancich v. United States,* 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976); *Mauriber v. Shearson/American Express, Inc.,* 546 F.Supp. 391, 396 (S.D.N.Y.1982); *Hanna Mining Co. v. Norcen Energy Resources, Ltd.,* 1982 Fed.Sec.L.Rep. (CCH) ¶ 98,742 at 93,737 (N.D.Ohio 1982); *Maryville Academy v. Loeb Rhoades & Co., Inc.,* 530 F.Supp. 1061, 1069 (N.D.Ill.1981); *Hellenic Lines, Ltd. v. O'Hearn,* 523 F.Supp. 244, 247–48 (S.D.N.Y.1981); *Spencer Companies, Inc. v. Agency Rent-a-Car, Inc.,* 1981–82 Fed.Sec. L.Rep. (CCH) ¶ 98,361 at 92,214 (D.Mass. 1981); *Engl v. Berg,* 511 F.Supp. 1146, 1155 (E.D.Pa.1981); *Heinold Commodities, Inc. v. McCarty,* 513 F.Supp. 311, 313 (N.D.Ill. 1979); *United States v. Vignola,* 464 F.Supp. 1091, 1095–96 (E.D.Pa.), *aff'd mem.,* 605 F.2d 1199 (3d Cir.1979), *cert. denied,* 444 U.S. 1072, 100 S.Ct. 1015, 62 L.Ed.2d 753 (1980); *United States v. Mandel,* 415 F.Supp. 997, 1018–19 (D.Md.1976).

*Accord, Blakey supra* note 16 at 284–84; Note *Application of the Racketeer Influenced and Corrupt Organizations Act (RICO) to Securities Violations,* 8 J.Corp.L. 411, 429 (1983). Indeed, to the extent that the Third Circuit has decided this issue, albeit in a criminal context,[17] I am bound by that ruling. In *Forsythe,* the Third Circuit noted that "the legislative intent was to make RICO violations dependent upon behavior, not status." *Forsythe,* 560 F.2d at 1136. That is the extent of the court's analysis. However, a brief exploration of RICO's legislative history will prove the validity of the *Forsythe* position and that of the other courts cited above.

At the outset, I note that the statute does not use the term "organized crime" or attempt to define that nebulous concept. According to the legislative history, this was a conscious decision by Congress. Fashioning a definition was recognized as a difficult task which would be of dubious benefit. *See, e.g.,* 116 Cong.Rec. 35,204–206 (Oct. 6, 1970); 116 Cong.Rec. 35, 343–345 (Oct. 7, 1970). For example, an amendment was proposed that would have made the mere membership in La Cosa Nostra an offense. 116 Cong.Rec. 35,343 (Oct. 7, 1970) (Rep. Biaggi). This was rejected as overly narrow and potentially unconstitutional. *Id.* at 35,344–346. However, the topic of the scope of the statute was hotly debated throughout the Congressional hearings. As Professor Blakey noted, during the 1970 House hearings, the Association of the Bar of the City of New York criticized the proposed Title IX as reaching beyond the scope of organized crime. *See Blakey, supra* note 16 at 272–73. A report issued by that body lambasted the addition of certain offenses, including securities fraud cases.[18] Relating to the Control of Organized Crime in the

---

**17.** Criminal decisions on this issue should have the same precedential import as civil rulings. *See Eaby, et al. v. Richmond, et al.,* 561 F.Supp. 131 at 133–34 (E.D.Pa.1983). If a court is amenable to extending criminal sanctions to those not linked with organized crime, no sound reason exists for not extending civil liability.

**18.** The Bar Association Report stated:

On the one hand, the crimes listed as "racketeering activity" include several categories which are plainly beyond the intention of the Senate Committee, as expressed in the Report, and which should not, in our view, be subjected to the severe penalties of Title IX. The Senate Report states: " 'Racketeering activity' is defined in terms of specific State and Federal criminal statutes now characteristically violated by members of organized

United States: Hearings on S.30 and Related Proposals Before Subcomm. No. 5 of the Comm. on the Judiciary, 91st Cong., 2d Sess. at 329 (1970) (emphasis added). The report stated:

> [W]ithin the definition of 'racketeering activity' is 'fraud in the sale of securities.' Against the background of expanding securities regulation, this definition could include the various officers, directors, and employees of corporations and underwriters of securities who have been found guilty of fraud in the sale of securities in some of the recent Rule 10(b)5 cases. Fraud in the sale of securities is simply not synonymous with racketeering activity.

Relating to the Control of Organized Crime in the United States: Hearings on S.30 and Related Proposals Before Subcomm. No. 5 of the Comm. on the Judiciary, 91st Cong., 2d Sess. at 401 (1970). Thus, RICO's reach beyond the talismanic "organized crime" into the field of securities fraud was well recognized by the Congress. Yet, section 1961(1)(D) was still enacted listing securities fraud as a predicate offense. The only inference to be drawn is that Congress intended to reach securities fraud cases as well as other types of cases which might not have a nexus to organized crime.[19]

In addition, many of the Congressmen verbally recognized that RICO was not intended to be so limited. Representative Poff stated that "the concept of organized criminal activity is broader in scope than the concept of organized crime; it is meant to include any criminal activity collectively undertaken . . . ." 116 Cong.Rec. 35,293 (October 7, 1970). Senator McClellan remarked:

> the curious objection has been raised to S.30 as a whole, and to several of its provisions in particular, that they are not somehow limited to organized crime itself . . . as if organized crime were a precise and operative legal concept like murder, rape or robbery. Actually, of course, it is a functional concept like white collar crime, serving simply as a shorthand method of referring to a large and varying group of criminal offenses committed in diverse circumstances.

116 Cong.Rec. 18,913 (June 9, 1970). These comments illustrate not only recognition of the broad scope of the statute, but they also point up some of the practical problems which would ensue, were RICO limited to "organized crime." For example, it would not be easy for a putative plaintiff to *prove* a defendant's affiliation with a certain organization. If it were easy enough for a private plaintiff to prove, then RICO would probably not have been necessary in the first instance. *See e.g., Hanna Mining,* 1982 Fed.Sec.L.Rep. ¶ 98,742 at 93,736–37. This burden of proof might well emasculate the private remedy provision. *See Mauriber,* 546 F.Supp. at 396. Perhaps more important, as Representative Poff's statement implied, limiting application of the statute might have the effect of contravening its purpose. Some of the targeted behavior could "slip through the cracks" because it might not fit comfortably into some artifi-

___

crime." Senate Report 34. This statement is not supported, however, by the language of the statute, which includes as racketeering activity such things as theft from an interstate shipment regardless of the value of the property stolen (18 U.S.C. § 659), unlawful use of a stolen telephone credit card (18 U.S.C. § 1343), the "mom and pop" variety of illegal gambling business which, as we point out above, would be covered by Title VIII (proposed 18 U.S.C. § 1955), *any securities fraud case,* and virtually any state felony or federal misdemeanor involving drugs—which would clearly include marijuana violations.

**19.** Commenting on the New York Bar Association's objections, Professor Blakey noted that:

> Despite this testimony, Title IX was not only reported out, but the treble damage clause was *added.* Accordingly, those who seek to have the courts restrict the scope of the statute to curtail its application to fraud are refighting in the judicial forum a battle they lost in the legislative arena . . . .

*Blakey, supra* note 16, at 273 n. 112. (Emphasis in original).

cial definition of organized crime.[20] To define the concept is to limit RICO's application—a result clearly at odds with the "liberal construction" proviso.

In light of Congress's recognition of RICO's broad scope, the refusal to omit such offenses as securities fraud from the list of predicate acts and in light of the liberal construction mandate, I conclude that a link to organized crime is not a requirement of a civil RICO cause of action. Defendants' motion to dismiss on this ground is therefore denied.

### 3. *Causation*

In order to collect treble damages under section 1964(c), a plaintiff must show that his injuries arise "by reason of a violation of section 1962." 18 U.S.C. § 1964(c). Defendants contend that the complaint fails to allege a sufficient nexus between plaintiffs' injuries and the alleged violation of section 1962. However, defendants are not really arguing that plaintiff did not suffer monetary damages as a result of the alleged fraudulent transactions. Rather, they are attacking the complaint for its failure to allege the *appropriate kind* of injury. *See Bennett v. Berg,* 685 F.2d 1053, 1058–59 (8th Cir.1982) (arguing no injury to property). It is defendants' position that something more than merely the injury occasioned by the commission of two or more predicate acts must be alleged. Specifically, a plaintiff must allege some type of "racketeering enterprise injury" or an injury to commercial or competitive interests.

Characterized as a "standing" requirement, this position is not without judicial support. *See, e.g., Harper v. New Japan Securities, International, Inc.,* 545 F.Supp. 1002, 1007 (C.D.Cal.1982); *Erlbaum v. Erlbaum,* 1982 Fed.Sec.L.Rep. (CCH) ¶ 98,772 at 93,922 (E.D.Pa.1982); *Van Schaick v. Church of Scientology,* 535 F.Supp. 1125, 1136–37 (D.Mass.1982) (commercial, not competitive injury); *Landmark Savings & Loan v. Rhoades,* 527 F.Supp. 206, 209 (E.D.Mich. 1981) (racketeering enterprise injury); *North Barrington Development, Inc. v. Fauslow,* No. 80–2644 (N.D.Ill. Oct. 9, 1980). *See also Spencer Cos. v. Agency Rent-A-Car, Inc.,* 1981 Fed.Sec.L.Rep. (CCH) ¶ 98,-361 at 92,216 (D.Mass.1981) (discussing infiltration as a possible requirement). *But see, e.g., Schact,* at 1358; *Bennett,* 685 F.2d at 1059; *Hanna Mining,* [Current] Fed.Sec. L.Rep. (CCH) ¶ 98,742 at 93,737. Defendants' attempt to erect artificial barriers around a RICO cause of action is not warranted by the language, purpose or history of the statute.[21]

The concept of competitive or commercial injury is one borrowed from the field of antitrust. Although the courts requiring it have failed to define it, apparently it involves injury to plaintiffs' ability to compete. The court in *Landmark,* allegedly eschewing a competitive injury requirement, defined, by way of illustration, the concept of a "racketeering enterprise injury." 527 F.Supp. at 209. A plaintiff can sue under section 1964(c), the court opined,

---

**20.** Senator McClellan, in explaining that RICO attempts to proscribe the type of crimes often committed by organized crime, praised their ingenuity:

Members of La Cosa Nostra and smaller organized crime groups are sufficiently resourceful and enterprising that one constantly is surprised by the variety of offenses that they commit. It is impossible to draw an effective statute which reaches most of the commercial activities of organized crime, yet does not include offenses commonly committed by persons outside organized crime as well.

116 Cong.Rec. at 18,940 (June 9, 1970).

**21.** The requirement of a commercial or competitive injury, like the necessity of proving a link to organized crime, may be reflective of judicial

discomfort with the broad sweep of RICO. Indeed, the statute federalizes many state offenses and provides supplemental remedies in areas where remedies already exist. The *Harper* court expressed this sentiment by noting that "[i]t is simply incomprehensible that a plaintiff suing under the securities laws would receive one-third the damages of a plaintiff suing under RICO for the same injury." 545 F.Supp. at 1007–08. Although a valid concern, it is one which is within the province of Congress. It is not the place of the judiciary to narrow a purposely broad statute by judicial fiat. As Professor Blakey commented, "the blunt truth is that some lower courts have been more intent on redrafting than reading RICO." *Blakey, supra* note 16, at 285.

"if a civil RICO defendant's ability to harm the plaintiff is enhanced by the infusion of money from a pattern of racketeering activity into the enterprise." *Id.* Despite the *Landmark* court's protestations to the contrary, I conclude that, as defined, a racketeering injury is indistinguishable from a competitive or commercial injury. The *Hanna* court, endeavoring to explain the latter concept, drew a scenario remarkably similar to the *Landmark* description. A plaintiff has a cause of action for an "illegal advantage gained by a defendant who operated or invested in an enterprise through racketeering activity." *Hanna,* 1982 Fed. Sec.L.Rep. (CCH) ¶ 98,742 at 93,737.

Borrowing antitrust concepts for application in the civil RICO context has a great deal of support in the legislative history. RICO was intended to combat the threat to the free market system posed by racketeer infiltration of legitimate business. Indeed, the antitrust laws were a model for RICO's civil provisions. Senator Hruska, in introducing a version of the civil statute noted:

> Patterned closely after the Sherman Act, it provides for private treble damage suits, prospective injunctive relief, unlimited discovery procedures and all the other devices which bring to bear the full panoply of our antitrust machinery in aid of the businessman competing with organized crime.
>
> . . . .
>
> The bill is innovative in the sense that it vitalizes procedures which have been tried and proven in the antitrust field and applies them where they have been seldom used before.

115 Cong.Rec. 6993 (March 20, 1969). Section 1964(c) closely tracks the language of section 4 of the Clayton Act.[22]

However, there is a limit upon what translates well from the antitrust genre to organized crime. The American Bar Association rejected a proposal for amending the Sherman Act to provide a civil RICO remedy, preferring instead separate statutes.

The Report of the Antitrust Division of the American Bar Association noted that "[b]y placing the antitrust-type enforcement and discovery procedures in a separate statute, [from the antitrust statutes] a commingling of criminal enforcement goals *with the goals of regulating competition is avoided.*" 115 Cong.Rec. at 6995 (emphasis added). The Report went on to say:

> [O]n the other hand, by inserting in the Sherman Act a provision which does not have as its primary objective the establishment or maintenance of free competition, may result in an undesirable blending of otherwise laudatory statutory objectives. Criminal conduct which violates existing antitrust laws can be proceeded against under those laws. Additional conduct sought to be reached should be attacked under separate legislation.
>
> Moreover, the use of antitrust laws themselves as a vehicle for combating organized crime could *create inappropriate and unnecessary obstacles in the way of persons injured by organized crime who might seek treble damage recovery. Such a private litigant would have to contend with a body of precedent—appropriate in a purely antitrust context—setting strict requirements on questions such as "standing to sue" and "proximate cause."*

115 Cong.Rec. at 6995 (emphasis added). This recommendation, which was adopted, recognized as inappropriate the application of the antitrust commercial injury-standing requirement in the RICO context. The court in *State Farm Fire and Cas. Co.,* observed that section 1964(c) was "cast as a separate statute intentionally to avoid the restrictive precedent of antitrust jurisprudence." 540 F.Supp. at 680. Along the same vein, Professor Blakey stated, "any suggestion that RICO actions be limited by antitrust-type limitations—"competitive," "commercial," or "direct/indirect" injuries—flies in the face of the very consideration that led to the drafting of RICO as a

---

**22.** This similarity in language was a result of a suggestion made by the American Bar Association. *Hearings on S. 30,* 91st Cong., 2d Sess. at

543–44 (1970) (testimony of Edward Wright, President Elect of the American Bar Association).

separate statute from the antitrust statutes that are so limited." *Blakey, supra* note 16, at 255 n. 52.

The American Bar Association Report also points up the different policies underpinning the antitrust and organized crime laws. The Eighth Circuit noted this policy distinction, stating that "although RICO borrowed the tools of antitrust law to combat organized criminal activity . . . . Congress did not see the objectives of RICO and the antitrust laws as coterminous." *Bennett v. Berg,* 685 F.2d at 1059 (citing S.Rep. No. 617 at 81–82; 115 Cong.Rec. 6993 (statement of Sen. Hruska); *id.* at 9567 (statement of Sen. McClellan); 116 Cong.Rec. at 607 (statement of Sen. Byrd); *id.* at 35, 193 (statement of Rep. Poff)). The limitations simply have no place in the organized crime context. The goal of antitrust law is to promote free competition. Frivolous antitrust suits might ruin defendants, who are legitimate business persons. One less business in a given area will increase concentration, thus decreasing competition. In the organized crime context, it does not matter if an illegal business activity is ruined—indeed that is exactly what RICO is endeavoring to accomplish. *Bennett,* 685 F.2d at 1059. Thus, the policy underlying the limits placed on private antitrust suits is inapposite in the RICO mileau.

Finally, reading a competitive injury requirement into section 1964(c) would create an insurmountable practical problem. This approach would literally require plaintiff to be in competition with defendant.[23] In the situation where an illegitimate enterprise is endeavoring to infiltrate and take over a competing business, this requirement would not be a problem. However, all potential plaintiffs will not fit into this category, leaving certain targeted behavior unpunished. As one commentator noted: "[t]he difficulty in proving causation may be significant for those plaintiffs who cannot prove infiltration." Note, *Application of the Racketeer Influenced and Corrupt Organization Act (RICO) to Securities Viola-*

*tions,* 8 J.Corp.L. 411, 435 (1983). This interpretation would be inconsistent with the broad remedial purposes behind RICO. As the court in *Hanna Mining* noted, "[t]o conclude otherwise . . . would leave undisturbed racketeers whose activity does not infringe on their competitor's markets. It is untenable to suggest that Congress intended such a result." 1982 Fed.Sec.L.Rep. ¶ 98,742 at 93,737. *Accord, Hellenic Lines, Ltd. v. O'Hearn,* 523 F.Supp. 244, 248 (S.D. N.Y.1981).

■ Given the legislative history and statutory objectives, I conclude that RICO does not require proof of a commercial or competitive injury. As the Seventh Circuit recently observed: "RICO was broadly aimed at 'striking . . . a mortal blow against the property interests of organized crime.' This court is reluctant to undermine that broad mission of RICO by engrafting onto its civil provisions a competitive injury requirement." *Schacht,* at 1357–58 slip op. at 29 (citations omitted). Plaintiffs' allegations that their monetary losses were a result of defendants' innumerable acts of securities fraud are sufficient to state a cause of action under section 1964(c).

### 4. Collapse of "Enterprise" Into Predicate Acts

Defendants claim that the amended complaint must be dismissed for failure to allege an "enterprise" separate and distinct from the "pattern of racketeering." Muir is undistinguishable from the alleged acts of securities fraud, they contend, pointing to language in the complaint to the effect that defendants were "transforming the nature of the firm into a vehicle for underwriting speculative new issues." (Complaint at ¶ 29). This argument misperceives the nature of both the law and the facts, as set forth in the amended complaint.

■ Defendants are correct in insisting that a RICO plaintiff must prove the existence of both an "enterprise" and a "pattern

---

**23.** Plaintiffs pose the following rhetorical question; "who would have standing to sue a group of racketeers who are engaged in a pattern of arson fraud? The gangster's competitors?" Brief in Opposition to Defendants' Motion to Dismiss at 26.

of racketeering activity." As the United States Supreme Court observed; "[t]he 'enterprise' is not the 'pattern of racketeering activity;' it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all times remains a separate element which must be proven." *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981). On a very commonsense level, the *Turkette* court characterized the enterprise as the actors and the pattern as the unlawful acts.[24] *Id.* The court decided that the enterprise need not be a legitimate entity and that RICO applies with as much force to enterprises formed for wholly illegal purposes. 452 U.S. at 584–85, 101 S.Ct. at 2529–30.

■ The enterprise alleged by plaintiffs is the partnership Muir. The statute specifically mentions a "partnership" as an appropriate entity for an enterprise.[25] The pattern alleged is an ongoing scheme of securities fraud, perpetrated by defendants, who are affiliated in various ways with Muir. However, Muir has an existence distinct from this pattern of fraud. Even though the complaint alleges that defendants were transforming Muir into a vehicle for the underwriting of speculative issues, it is also alleged that Muir was a brokerage and investment banking firm until it went into receivership in August of 1981. (Complaint at ¶ 5). As such, it still rendered services to its customers apart from the alleged acts of fraud.

The Eighth Circuit rejected a remarkably similar argument in *Bennett v. Berg,* 685 F.2d 1053 (8th Cir.1982). In *Bennett,* plaintiffs were former residents of the John Knox Village retirement community. They sued the Village, various officers and directors, its founder, mortgage lender, insurance company, former accountant and attorneys, alleging, *inter alia,* fraud, breaches of fiduciary duties and a RICO claim. 685 F.2d at 1057. An Entrance Endowment paid by those wishing to live in the Village entitled them to a specified apartment for life. An additional monthly charge covered food, laundry, medical services, transportation and building maintenance. The alleged fraud surrounded defendants promise of "affordable life care" and misrepresentations with respect to the financial well being of the Village, which was, at the time of suit, on the verge of bankruptcy. *Id.* at 1056–57. The complaint depicted the Village as "pervasively fraudulent." *Id.* at 1060. This allegation parallels the averred transformation of Muir. Defendants in *Bennett* argued that there were insufficient allegations of an enterprise distinct from the pattern of racketeering. The court noted that the complaint alleged that the Village "provided numerous legitimate services," and went on to conclude that "[a]s an entity providing such services, and as an incorporated body under the laws of the State of Missouri, the John Knox Village corporation has an ascertainable structure apart from any predicate acts of mail fraud." *Id.* Muir, like the Village, has a structure apart from the predicate acts and apparently still provided legitimate brokerage services to its customers. Muir is also a legal entity, as was the Village.[26] Thus, under the *Bennett* approach, Muir would qualify as an "enterprise" for RICO purposes.

In support of their position, defendants cite *United States v. Lemm,* 680 F.2d 1193 (8th Cir.1982), a case which actually under-

---

**24.** The court defined the enterprise as "an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct." 452 U.S. at 583, 101 S.Ct. at 2528. The pattern of racketeering "is, on the other hand, a series of criminal acts as defined by the statute." *Id.*

**25.** Enterprise is defined as "any individual, *partnership,* corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal enti-

ty." 18 U.S.C. § 1961(4). Thus an enterprise can either be a legal entity or an association of some form. *See Bennett v. Berg,* 685 F.2d 1053, 1060 & 1060 n. 9 (8th Cir.1982).

**26.** The *Bennett* court noted that an entity is more likely to be deemed an "enterprise" distinct from acts of racketeering when it is a creation of the law. 685 F.2d at 1060–61 and 1060 n. 9.

cuts their contention. In *Lemm,* the Eighth Circuit found the requisite separation between the enterprise and the pattern where the "enterprise" consisted of a loose federation of persons involved in an arson-insurance fraud ring.[27] Mail fraud constituted the predicate acts. 680 F.2d at 1201. A licensed insurance adjuster named Gamst recruited individuals to find property to purchase and then hired people to set fires to the properties and collected the insurance proceeds. The defendants in *Lemm* were Gamst's recruits. *Id.* at 1196–97. The court stated:

> The arson ring, through hand-delivery of insurance claims, could have conducted its activities without any predicate acts of mail fraud. In other words, if we eliminate for purposes of argument the predicate acts of mail fraud, the evidence still shows an on-going structure which engaged in legitimate purchases and repairs of property as well as acts of arson.

*Id.* at 1201. Similarly, if the predicate acts of securities fraud were eliminated, Muir still had an on-going structure as a brokerage house. Moreover, despite the *Lemm* court's distinction, defendants' link to one another was only the perpetration of arson. Here, defendants are linked through a separate, legitimate business. Thus, I conclude that Muir was an enterprise distinct from the alleged securities fraud. Defendants' motion is therefore denied.

### 5. *Section 1962(a)*

Defendants' final RICO argument involves plaintiffs' failure to adequately allege a violation of section 1962(a) against defendant Peterson. Section 1962(a), set out in full *supra,* basically prohibits an individual from using money received through a pattern of racketeering to invest in the enterprise. Peterson was a broker for Muir, but the complaint does not allege that

he ever had any ownership interest in Muir, nor was it alleged that Peterson used the 5% commission he earned on plaintiffs' transactions to invest in the partnership. Thus, I conclude that on the face of the complaint, the requisites of a section 1962(a) are absent.[28] Defendants' motion on this point shall be granted. The section 1962(a) claim against Peterson is dismissed without prejudice to file a more specific pleading.

### D. INFLICTION OF EMOTIONAL DISTRESS

Count XI of the amended complaint purports to set out a claim for infliction of emotional distress, alleging that plaintiffs suffered significant mental and physical trauma as a result of defendants acts and that defendants knew or should have known that this would occur. Defendants move to dismiss this count, asserting that plaintiffs have not stated a cause of action for either negligent or intentional infliction of emotional distress.

At the outset, I note that it is not altogether clear whether plaintiffs are claiming negligent infliction of emotional distress. Although the count is labeled simply "infliction of emotional distress," the averment that defendants knew or should have known the results of their conduct bespeaks intentional action. In addition, plaintiffs responded to defendants' motion only on the intentional infliction issue, rendering unopposed defendants' motion on the negligent infliction issue. However, in the event that plaintiffs did intend to allege negligent infliction as well, I must agree with defendants that no cause of action has been established. Giving plaintiffs' factual allegations the most expansive reading possible, this case simply does not rise to the

---

**27.** The court in *Lemm* held that a RICO enterprise must meet three tests: (1) a shared purpose; (2) continuity of personnel and (3) a structure distinct from the pattern. 680 F.2d at 1198. The defendants, as affiliates of Muir had a shared purpose to defraud plaintiff. The continuity of personnel and requisite structure are also present.

**28.** Plaintiffs' only rebuttal to this argument is the assertion that a claim was stated and the suggestion that the appropriate remedy is requiring a more specific pleading, rather than dismissal.

level of negligent infliction of mental distress. *See, e.g., Niederman v. Brodsky,* 436 Pa. 401, 403–04 261 A.2d 84, 90 (1970) (plaintiff can recover for injuries suffered as a result of watching son being struck by automobile when he was also in grave danger of being struck himself); *Sinn v. Burd,* 486 Pa. 146, 173, 404 A.2d 672, 686 (1979) (mother can recover for distress resulting from watching minor daughter struck and killed by automobile without herself being in the zone of danger); *Yandrich v. Radic,* 495 Pa. 243, 244, 433 A.2d 459, 460–61 (1981) (no recovery for plaintiff not present at all when son injured; equally divided court affirming court below). *See also Kutner v. Eastern Airlines, Inc.,* 514 F.Supp. 553, 558–59 (E.D.Pa.1981) (no cause of action for distress suffered when plaintiffs drove home by car in bad weather conditions allegedly because airline failed to apprise them of their ability to take a bus or stay overnight).

With respect to the claim of intentional infliction of emotional distress, defendants argue that the alleged behavior does not rise to the level of "extreme and outrageous" conduct. Plaintiffs contend that whether the conduct was extreme and outrageous is a factual question for the jury to decide. Viewing all factual allegations and reasonable inferences drawn therefrom in a light most favorable to the plaintiff, I conclude that plaintiffs' complaint fails to establish outrageous conduct as a matter of law.

Section 46 of the Restatement (Second) of Torts defines the intentional infliction of emotional distress as follows:

> One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

Restatement (Second) of Torts § 46(1) (1965). Although Pennsylvania has apparently adopted the Restatement formulation *sub silentio, see D'Ambrosio v. Pennsylvania National Mutual Casualty Insurance Co.,* 494 Pa. 501, 511 n. 8, 431 A.2d 966, 971–72 n. 8 (1981); *Papieves v. Lawrence,* 437 Pa. 373, 379, 263 A.2d 118, 121 (1970); *Jones v. Nissenbaum, Rudolph & Seidner,* 244 Pa.Super. 377, 382, 368 A.2d 770, 772 (1976), there is a paucity of caselaw on this topic. The Restatement definition has been broken into four elements by the Third Circuit: (1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress and (4) the distress must be severe. *See Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265, 1273 (3d Cir. 1979). For purposes of their motion, defendants assume that plaintiffs have satisfied the last three elements—contesting only whether the conduct was extreme and outrageous.

Only in very extraordinary cases have plaintiffs been held to state a cause of action under this tort. In *Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265 (3d Cir.1979), the Third Circuit, predicting how Pennsylvania Supreme Court would rule, affirmed a district judge's decision to send the intentional infliction issue to the jury. There the team doctor had told a sportswriter that a famous football player was suffering from a fatal disease, polycythemea veria, knowing that he did not have that disease. Plaintiff later read this public prognosis and suffered severe mental anguish. This conduct, reasoned the court "could reasonably be regarded as extreme and outrageous." 595 F.Supp. at 1274. Similarly, in *Papieves v. Lawrence,* 437 Pa. 373, 263 A.2d 118 (1970) the court found a cause of action for intentional infliction established where defendant struck plaintiff's son, killing him and, without informing anyone except a friend, hid the body. After a few days in his garage, the body was moved and placed in a hand dug grave. The minor's parents were not informed until the partially decomposed remains were found and returned to plaintiffs. 437 Pa. at 375, 263 A.2d at 121.

These egregious situations must be compared with those cases denying a cause of action for intentional infliction. In *Mullen v. Suchko,* 279 Pa.Super. 499, 421 A.2d 310

(1980) a woman was asked by her lover to leave her job so she would be more free to travel with him. In return, he promised to care for her financially for the rest of her life. She left a job of thirty-three years and soon thereafter, he followed suit and left her. The court sympathetically noted that although defendant's actions were "inconsiderate and unkind," they were not "extreme and outrageous." 279 Pa.Super. at 505, 421 A.2d at 313. In *Jones v. Nissenbaum, Rudolph & Seidner,* 244 Pa.Super. 377, 368 A.2d 770 (1976), a law firm hired by a credit company informed plaintiffs, by letter, that their homes were going to be sold from under them to satisfy their debts. The firm knew that under law, they could not hold a sale absent a hearing. Additionally, one plaintiff was verbally told, in front of neighbors, that he had 30 days in which to move his "junk" out. Again the court found that this failed to rise to the level of outrageous conduct. 244 Pa.Super. at 383–85, 368 A.2d at 744. *See also D'Ambrosio,* 494 Pa. at 511 n. 8, 431 A.2d at 971–72 n. 8 (insurance company's alleged "bad faith" failure to honor a claim does not rise to level of extreme or outrageous conduct); *Forster v. Manchester,* 410 Pa. 192, 199–200, 189 A.2d 147, 151–52 (not outrageous to follow an accident victim, conducting surveillance to determine the extent of the injury); *Mazzula v. Monarch Life Insurance Co.,* 487 F.Supp. 1299, 1302 (E.D.Pa.1980) (not outrageous to refuse to continue to pay disability insurance).

Although this case does not fall neatly into either category, it most certainly is closer to the latter cases than the former. Plaintiffs strenuously argue that this is not a "garden variety" securities fraud case, but rather a course of fraudulent conduct perpetrated by a trusted advisor. However, that does not mean that the case rises to the level of outrageous conduct. It involves the mere loss of money, not the more personal loss of a life or health as in *Papieves*

or *Chuy.* Comment (d) to section 46 indicates:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society. Generally, the case is one in which the recitation of facts to an average member of the community would arouse his resentment against the action, and lead him to exclaim "outrageous."

This case simply does not fit the above description and Count XI shall be dismissed.[29] To hold otherwise would transform every sophisticated confidence scheme into an action for intentional infliction of mental distress in clear derogation of the narrow scope accorded this tort by the Pennsylvania courts.

## E. AIDING AND ABETTING

Defendant Mario Andretti moves to dismiss those counts of the amended complaint which attempt to characterize him as a participant in this securities fraud scheme. According to the amended complaint, Andretti's only involvement surrounds his introduction to the Kimmels during the Montreal Grand Prix in September of 1979. Dirks introduced Andretti as one of Muir's general partners at a party and "Andretti gave plaintiffs no reason to believe he was not a General Partner." Amended Complaint at ¶ 28. Andretti is apparently only a limited, rather than general, partner. This is the sole allegation against Andretti, with the exception of plaintiff's assertion that his conduct constitutes "aiding and abetting."

Defendant cites several grounds for his motion, some of which rely on extraneous evidence, reference to which would require me to treat this as a motion for summary judgment. Since I can dispose of this issue

---

**29.** In his motion to dismiss, defendant Mario Andretti also notes that Count XI should be dismissed, as his failure to correct Mr. Peterson as to his status as a limited, rather than general, partner in Muir fails to state a cause of action for intentional infliction. For all of the reasons stated above, I agree. Mr. Andretti's conduct is simply not "outrageous," as that term has been defined under Pennsylvania law. Count XI shall be dismissed against all defendants.

on the face of the complaint itself, I will not refer to this extraneous material.[30]

In order to establish a claim of aiding and abetting in this Circuit, the plaintiff must satisfy a tripartite test. The plaintiff must allege and prove that (1) there was an underlying violation of the securities laws; (2) that the aider-abettor had knowledge of the violation and (3) that the aider-abettor "knowingly and substantially participated in the wrongdoing." *Monsen v. Consolidated Dressed Beef Co., Inc.,* 579 F.2d 793, 799 (3d Cir.1978), *cert. denied,* 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1979); *Gould v. American-Hawaiian Steamship Co.,* 535 F.2d 761, 779 (3d Cir.1976); *Landy v. Federal Deposit Insurance Corp.,* 486 F.2d 139, 162–63 (3d Cir. 1973), *cert. denied,* 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974); *Keller v. Coyle,* 499 F.Supp. 1031, 1033 (E.D.Pa.1980). Many courts have couched the third prong in terms of "substantial assistance" in the achievement of the underlying violation. *See, e.g., SEC v. Seaboard Corp.,* 677 F.2d 1289, 1296 (9th Cir.1982); *Herm v. Stafford,* 663 F.2d 669, 684 (6th Cir.1981); *ITT, An International Investment Trust v. Cornfeld,* 619 F.2d 909, 922 (2d Cir.1980).

I will assume for purposes of this motion that an underlying violation of the securities laws has been established, thus satisfying the first prong. However, the complaint fails to allege that Andretti had any knowledge of the web of fraud allegedly woven by the other defendants. This violates the Third Circuit's directive that an aider-abettor have "conscious involvement in impropriety or constructive notice of intended impropriety" or even a "general awareness that his role was part of an overall activity that is improper." *Monsen,* 579 F.2d at 799 (citations omitted). In the absence of an allegation that Andretti knew of defendants' scheme, the motion to dismiss must be granted. *Accord, Keller v. Coyle,* 499 F.Supp. 1031, 1034 (E.D.Pa.1980) (motion for summary judgment granted in favor of defendants lacking knowledge of fraud).

In addition, the amended complaint fails to satisfy the final prong of the test. Substantial assistance or participation is required to establish liability as an aider-abettor. The *Monsen* court noted that mere inaction without conscious participation does not rise to the level of aiding and abetting. 579 F.2d at 800. That is exactly what occurred here. Andretti failed to correct Dirks, but as far as the complaint is concerned, did so without knowledge or the intent to participate. Moreover, even if Andretti had knowledge or the necessary intent, there would still be a serious question as to whether his activity could rise to the level of substantial assistance. It is highly unlikely that Andretti's silence as to his type of partnership interest substantially assisted the other defendants in their quest to dupe Kimmel into becoming a partner. Andretti's alleged role in this venture was so miniscule as to be incapable of supporting a claim of aider-abettor liability. For these reasons, Mario Andretti's motion to dismiss for failure to state a claim shall be granted.

---

**30.** Defendant argues that since Kimmel had to sign the partnership agreement before becoming a partner and since that agreement listed Andretti as a limited partner, Kimmel had notice and no fraud occurred. Were I to rest my decision on the partnership agreement submitted by Andretti, I would probably agree. This impacts upon the materiality of the misrepresentation. While it is dubious in the abstract, whether Andretti's misrepresentation would be material to Kimmel's decision to become a limited partner in Muir, knowledge would certainly defeat materiality. I note that it is not clear that Andretti had a duty to correct Dirks' misstatement.